Filed 6/30/14

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S039894 |
| v. | ) | |
| | ) | |
| CHRISTOPHER JAMES SATTIEWHITE, | ) | |
| | ) | Ventura County |
| Defendant and Appellant. | ) | Super. Ct. No. CR 31367 |
| _____ | ) | |

## I. PROCEDURAL HISTORY

A jury convicted defendant Christopher James Sattiewhite of the rape (Pen. Code, § 261),[1] kidnapping (§ 207), and murder (§ 187) of Genoveva Gonzales. The jury found true the special circumstance allegations that the murder occurred during the commission of the rape and kidnapping (§ 190.2, subd. (a)(17)(B), (C)), and it found that defendant personally used a firearm during the commission of the murder (§§ 1203.06, 12022.5).

---

[1] All statutory references are to the Penal Code unless otherwise specified.

1

The jury returned a verdict of death. The trial court denied defendant's motion for a new trial and for modification of the verdict (§ 190.4, subd. (e)), and it sentenced him to death. This appeal is automatic. (§ 1239, subd. (b).)

The judgment is affirmed in its entirety.

## II. FACTUAL BACKGROUND

### A. Guilt phase

#### 1. Prosecution's case

##### a. The murder of Genoveva Gonzales

Early in the morning of Sunday, January 26, 1992, two fishermen discovered the partially nude body of Genoveva Gonzales in a roadside ditch near the beach on the outskirts of the City of Oxnard. She had been shot in the head three times at close range with a .32-caliber gun. There was one set of footprints near the body and no sign of a struggle. Although blood had pooled under Gonzales's head, there was no blood trail, suggesting that someone had carried her to the ditch, dropped her to the ground, and shot her.

##### b. Defendant's activities from January 25, 1992, to January 26, 1992

On Saturday, January 25, 1992, Anna Lanier loaned her car to defendant, Bobby Rollins, and Fred Jackson in exchange for drugs. The three men, who were all associated with the Long Beach Crips gang, spent the day driving around the City of Oxnard. At dusk, when Jackson suggested committing a robbery, Rollins decided to leave the group. Later that night, however, Rollins rejoined defendant and Jackson in an alley in Oxnard. He saw Jackson and a woman in the backseat of Lanier's car. Jackson leaned over and pushed the woman down.

According to Rollins, defendant then drove Jackson and the woman to a nearby parking lot at the Mira Loma Apartments, and Rollins followed in a

different car. Rollins and defendant then got out of their cars to talk, while Jackson stayed in the backseat with the woman. Defendant told Rollins that they had "just gaffled the lady." Rollins understood this to mean that they had abducted her. Rollins heard the woman yell in Spanish, and he heard Jackson tell her to "shut up." The woman then spat on Jackson. In response, Jackson hit her several times and pushed her into a corner of the backseat. In Rollins's view, the woman was not "going along with what Jackson was doing."

Rollins went to make a telephone call, and when he returned, Jackson was having sex with the woman in the backseat of the car. Defendant told Rollins that when Jackson finished, they were going to drive to "the dead end," a remote area on Arnold Road, to drink alcohol. Rollins agreed to meet them there.

When Rollins arrived at the dead end, Lanier's car was parked on the side of the road. Defendant was outside, and Jackson was in the backseat, pushing the woman out. She appeared to be unconscious. As Rollins was parking his car, he heard three gunshots. Jackson was still in the backseat of the car, but the woman was lying in a nearby ditch with defendant standing over her. Rollins could see that she was naked from the waist down (except for one sock) and that her jacket and shirt were open, with her bra pushed up above her breasts.

Defendant climbed out of the ditch carrying a gun and wearing gloves. He returned to the driver's seat of Lanier's car, gave the gun to Jackson, and drove off. Rollins followed them to an alley, where they parked and got out of their cars. Jackson removed some clothing from the car and wiped the gun. Rollins saw blood on the clothing. Jackson tossed the clothing into a nearby garbage bin, and defendant did the same with his gloves.

When Rollins asked defendant why he had shot the woman, defendant replied that he had "always wanted to do something like that." Defendant pointed to his forehead and cheek and said, "I did it right here."

3

In early 1992, Adrienne Wells was defendant's girlfriend. One day she noticed he was "acting weird" and asked him why. Defendant replied that he had "killed a lady." Defendant said that his friend Jackson had raped the woman and that he (defendant) killed her because she had heard one of their names.

### c. The gun

Greg Wells sold a handgun to defendant on January 25, 1992, the morning of the Gonzales murder. Defendant promised to pay Wells later. After two weeks, however, defendant tried to give the gun back. Wells noticed that there was "something on the gun" and refused to take it. He suggested that defendant sell the gun and drove him to see someone who might buy it. On the way, defendant cleaned the gun, which he then sold. The police later recovered the gun after it was used in a robbery. Ballistics tests confirmed that the gun used in the robbery was the gun used to kill Gonzales.

### d. The autopsy

Dr. Frederick Lovell, the Chief Medical Examiner for Ventura County, conducted the autopsy of Genoveva Gonzales on January 26, 1992. The cause of death was gunshot wounds to the head and neck. Dr. Lovell found a gunshot wound in the forehead, a double wound in the left cheek, and three bullets lodged in the body. All were contact wounds. Dr. Lovell noted a "very fresh" hemorrhage on the right side of the victim's head that could have resulted from a blow sufficient to render her unconscious. There were scratches on her abdomen and back, as well as bruising on the rear part of the entrance to her vagina. In Dr. Lovell's view, it was not possible to determine whether consensual or nonconsensual sexual activity had caused the bruising.

4

Genetic testing of sperm samples retrieved from Gonzales's body excluded defendant and Rollins as donors, but the testing did not eliminate Jackson as a possible donor.

Dr. Bruce Woodling, an obstetrician who also conducted forensic medical evaluations, testified as an expert for the prosecution. In his opinion, Gonzales received the injuries on her torso and vagina during a struggle. The subcutaneous bleeding from blunt force trauma, the injuries to the rear part of her vaginal opening, the petechiae in her eyelids, and the scratches on her abdomen, thorax, and hip were all "classic injuries" resulting from sexual assault and forced penetration, not from vigorous consensual sex. Dr. Woodling's opinion was unaffected by the suggestion that Gonzales might have been a drug user and a prostitute.

### e. Defendant's statement to police

Sergeant Richard Gatling of the Ventura County Sheriff's Office interviewed defendant while he was incarcerated on unrelated offenses.[2] The jurors heard a recording of that interview. Defendant initially denied knowing Gonzales but then said he had met her on the night of the murder while he and Jackson were driving around. Defendant denied shooting her.

### 2. Defendant's case

In his opening statement, defense counsel conceded that defendant shot Gonzales but asserted that the evidence would show that defendant did so under

---

[2] Defendant, Rollins, and Jackson were arrested for — and convicted of — robbing M.S. and Jaime Marquez and raping M.S. The prosecution introduced evidence of these crimes at the penalty phase.

duress, and therefore that he was not guilty of first degree murder.  He also asserted that the evidence would show that Gonzales willingly got in Lanier's car and that she engaged in consensual sexual activity with Jackson, and therefore that she had not been kidnapped or raped.

### a.  Claim of duress

Lydia Sattiewhite, defendant's sister, testified that after the killing, Rollins told her that "they picked up a girl and that [Jackson] fucked her."  Rollins also told her that "they took [the girl] to Arnold [Road] and told [defendant] to smoke her because [defendant] always stood around and watched them as they do their dirt."  Rollins said that he had threatened to shoot both Gonzales *and* defendant if defendant refused to shoot Gonzales.  In Lydia's opinion, based on years of observing defendant and Rollins together, defendant was afraid of Rollins.

### b.  Claim that Gonzales was not kidnapped or raped

Defendant presented evidence that in January 1990, Gonzales was convicted of possessing cocaine for sale.  According to Michael Black, who had seen Gonzales around his neighborhood and in the company of Rollins, Gonzales sold drugs, used drugs herself, and traded sex for drugs.  Lydia Sattiewhite testified that Rollins told her that Gonzales had been drinking on the night of the murder and that she appeared at times to be "going along" with the sex with Jackson, although at other times she pushed him away.  Dr. Werner Spitz, a forensic pathologist, reviewed the medical examiner's report and the autopsy photographs.  He disagreed with Dr. Woodling's opinion that Gonzales was forced to engage in sexual activity, but he acknowledged on cross-examination that "you don't need a rocket scientist to look at these [crime scene] pictures to determine that there has been a sexual assault here."

6

Sergeant Gatling testified that Jackson had told him that he and Gonzales had engaged in consensual sex.

### 3. Prosecution's rebuttal

Defendant told a deputy district attorney during an interview that he was not afraid of Rollins. In addition, there were no records of Gonzales's ever having been arrested for prostitution. Finally, the prosecution's investigator testified that Lydia Sattiewhite had told her that Rollins had said that Jackson had raped Gonzales.

## B. Penalty phase

### 1. Prosecution's case in aggravation

#### a. The Oxnard Beach robbery and rape

The prosecution presented evidence that defendant had pleaded guilty to the second degree robberies of M.S. and Jaime Marquez and the forcible rape in concert of M.S. M.S. and Marquez testified that on the evening of September 14, 1991, three men approached them while they were sitting on Oxnard Beach. One of the men pointed a gun at the couple and demanded their money and jewelry, threatening to "blow [them] away." The men forced the couple to lie down on the sand, covered their heads with a blanket, and told them not to look out. The man with the gun sat behind the couple. He kept the gun pointed at them and at times pressed it against M.S.'s head. When Marquez told the man with the gun to point it at him rather than at M.S., the man struck Marquez in the back of the neck. One of the men took Marquez's car keys, walked to the parking lot and returned several minutes later. The men also took rings and gold chains from the couple, and they identified themselves as Crips. At some point, one of the men touched M.S.'s leg and said, "Feel like fucking this." Two of the men then raped M.S. When the second man finished, one of the men told the couple to take their keys

7

and run to their car. They did so and drove to a friend's nearby house, where they called the police.

Genetic testing conducted on sperm found in vaginal samples taken from M.S. conclusively excluded defendant as a donor of the sperm but could not eliminate Jackson and Rollins as donors. Because they averted their eyes or a blanket covered their heads for most of the ordeal, the couple could not identify their attackers.

M.S. and Marquez later married. Their fear of being killed during the attack had remained with them and affected their relationship. They had difficulties communicating and had not been able to return to the beach. M.S. did not feel safe in public places or in her own home and was fearful that she would be retaliated against for testifying.

### b. Threatening jail correspondence

The prosecution introduced letters exchanged between defendant and Rollins while they were in jail. In the letters, defendant threatened violent retaliation against Rollins for having cooperated with the prosecution.

### c. Victim impact evidence

The prosecution offered victim impact testimony from the teachers of two of Gonzales's children, from Gonzales's son, and from her mother.

Before Gonzales's murder, her daughter always did her homework, and she came to school clean and well dressed. Although she had always been shy, after the murder, she was even shyer, often clinging to her teacher's side during recess. She was also sad and showed signs of stress.

Similarly, before the murder, Gonzales's son was an agreeable, outgoing, fourth-grade student. His attendance at school was very good. He wanted to become a doctor and asked for extra homework to improve his abilities. His

teacher planned to recommend that he join a program for gifted students. After the murder, however, his attendance became sporadic, and his scholastic efforts waned. His teacher no longer felt she could refer him to the gifted-student program.

Gonzales's son testified that before his mother was murdered, his family life was fun. He liked to help his mother pack school lunches. She came to his baseball games and watched him play. She always made sure the family had a place to live and food to eat. After the murder, he and his siblings did not have as much fun together. He was also afraid someone would break into the house and harm his sisters.

Gonzales's mother testified that her daughter worked four days a week as a seamstress. She took good care of the children, preparing meals for them, despite her work schedule, and sewing clothes for them. After their mother's murder, the children did not want to talk about her.

## 2. *Defendant's case in mitigation*

### a. *Defendant's childhood*

During the month before defendant was born, his mother was involved in two car accidents. In both incidents, her car was hit from behind, and she was thrown, abdomen first, into the dashboard. She experienced pain and intermittent bleeding from that time until defendant's birth. According to the defense witnesses, defendant had a history of early neurodevelopmental delays that could be attributed to brain damage resulting from hypoxia, the interruption of the flow of oxygen, near the time of birth. He had lifelong learning disabilities, and at the time of the trial he functioned at between the third and fourth grade levels in reading comprehension, math, and spelling.

Defendant's father, the Reverend J.D. Sattiewhite, worked as a technician at Camarillo State Hospital and was a minister of the Oxnard Church of Christ. Defendant was the fifth of his 10 children and his first son. J.D. wanted his son to be perfect. He refused to acknowledge that defendant was developmentally disabled, and he physically abused him, believing that defendant simply was not trying hard enough. This abuse caused injuries to defendant, but the family never sought medical help because they feared having to explain what had happened. Although those outside the family viewed J.D. as a friendly, loving man of God, the family members knew him to be cold and physically abusive.

As a child, defendant was always polite and respectful to others. He did not smoke, take drugs, or curse. He tended to be a follower, not a leader. He was enrolled in special education classes at school and graduated with a high school diploma, although he attained only a second or third grade level in reading and math. J.D. did not attend the graduation ceremony because defendant had not graduated from "regular school." Defendant later tried, without success, to enroll in a music school and to join the United States Navy. He worked for a time as a cook's helper at a fish market. He generally worked hard and performed his duties competently.

During defendant's high school years, J.D. often insisted that defendant join him in his nightly viewing of violent pornographic videos. J.D. left the family for another woman when defendant's mother was in the hospital giving birth to her 10th child. Within a year, defendant started "hanging around" with Rollins and Jackson and drinking beer.

### b. Psychological evaluations

#### i. Francis Crinella, Ph.D.

Clinical psychologist Francis Crinella interviewed defendant and reviewed the results of various neuropsychological examinations. In his opinion, defendant suffered from hypoxia at the time of his birth, likely as a result of his mother's two car accidents, and the hypoxia resulted in a number of medical and psychological problems that persisted throughout his life. He scored a 75 on the verbal part of the intelligence quotient (IQ) test and a 76 on the performance part of the test, for a full-scale IQ score of 74, which Dr. Crinella characterized as indicating borderline mental retardation. Defendant appeared to be out of touch with reality, and he had little imagination and extremely poor judgment. He had little ability to contemplate future events and poor adaptive behavior overall. Dr. Crinella identified defendant as a "moral imbecile," or a person with very primitive moral judgment.

Dr. Crinella acknowledged on cross-examination that some facts undermined the view that defendant was intellectually disabled, including his general ability to take care of himself, his extensive work history (without any termination for incompetence), his attendance at college-level business management courses, and the absence of any observable abnormalities in a scan of his brain. Defendant told Dr. Crinella that he started using illegal drugs when he was 16 years old and that he associated with gang members. Defendant never told Dr. Crinella that he had shot Gonzales while acting under duress.

#### ii. Ines Monguio, Ph.D.

Clinical psychologist Ines Monguio interviewed defendant and his mother and administered tests to determine whether defendant had brain impairment. Monguio said that defendant "could not put together more than maybe four or five words in a sentence that would make sense before his speech would break down."

11

His speech lacked maturity and sophistication, and he had difficulty processing information. He had a "globally impaired brain," including disabilities in learning, attention, abstract thought, and verbal skills. In Dr. Monguio's view, defendant's father's leaving the family made defendant angry, and he was unable "to do anything constructive with the anger." Dr. Monguio thought that it was highly unlikely defendant was capable of planning and executing a complex act requiring more than one step and that he could not recognize the moral and physical significance of shooting Gonzales.

### iii. Patrick Barker, Ph.D.

Forensic psychologist Patrick Barker evaluated defendant's emotional and cognitive functioning. In Dr. Barker's view, defendant was in touch with reality, although defendant also reported frequent delusions that some other being or presence was nearby. Defendant's speech was "somewhat odd" and deficient. He had moderately exaggerated notions of his abilities and potential, while his insight, ability to make appropriate judgments, and comprehension were all below average. Psychological tests revealed defendant had a full-scale IQ of 73, or borderline mental retardation. Personality tests revealed that defendant was angry, antisocial, at times delusional, agitated, confused, alienated, and grandiose, and that he had poor judgment and could have psychotic-like symptoms when he was under the influence of drugs. Dr. Barker diagnosed defendant as suffering from borderline mental retardation and mixed personality disorder with strong antisocial and schizotypal traits.

Defendant told Dr. Barker that he respected and feared his father, J.D. In Dr. Barker's view, watching the violent, X-rated videos with J.D. was confusing to defendant, but it resulted in a feeling of power and strength. Defendant indulged in persistent, aggressive, and homicidal impulses and fantasies inspired

12

by the videos. J.D.'s departure from the family removed the severe restrictions of his childhood, and defendant began using drugs and alcohol, associating with gang members, purchasing weapons, and socializing with both men and women. J.D.'s abandonment of the family caused defendant to hate him and to feel an increased sense of confusion about his own life.

Dr. Barker and defendant had two conversations about the murder. In the first, defendant told Dr. Barker "it just happened." In the second, defendant said he shot Gonzales because Jackson told him to do so. He did not say that Jackson forced him to do so. In Dr. Barker's opinion, defendant knew that his shooting of Gonzales would kill her. Defendant understood the wrongfulness of that action and also the wrongfulness of the robbery and rape on Oxnard Beach.

### iv. David Benson, M.D.

Defendant was evaluated at the neurobehavioral teaching clinic at the University of California, Los Angeles, under the supervision of Dr. David Benson. After neurological, mental status, and neuropsychiatric evaluations were conducted, a panel of physicians, including Dr. Benson, reviewed the results and interviewed defendant. The panel's opinion was that defendant's brain was abnormal, most likely as a result of the two car accidents his mother suffered just before his birth. He lacked the ability to think abstractly or to learn complex tasks, and he had difficulty discerning right from wrong at anything but an elementary level.

### 3. Prosecution's rebuttal

Dr. Ronald Markman, a psychiatrist with a specialty in forensic psychiatry, testified for the prosecution in rebuttal. He had listened to the testimony of the defense experts and reviewed the prosecution's "murder book," which contained all of the information related to the case, including police reports, probation

13

reports, witness statements, defendant's criminal record, and the defense experts' reports. He attempted to interview defendant, but defendant refused.

Dr. Markman challenged the conclusions drawn by defendant's experts regarding defendant's mental status. Dr. Markman pointed out that the Diagnostic and Statistical Manual of Mental Disorders III-R classified an IQ score of 74 not as "borderline mental retardation" but as "borderline intellectual function." He explained that mental retardation is a permanent mental disorder, but it is possible to improve intellectual function with treatment.

In Dr. Markman's opinion, defendant did not show poor adaptive behavior, given his ability to get along with his sisters and extended family, as well as students and teachers at school; his ability to graduate from high school and attend college classes; and his ability to perform competently the varied tasks at his jobs. Defendant also exhibited "street smarts." He could perform practical tasks and recognize the future effects of his actions.

Dr. Markman noted that people with lower than average IQ scores tend to be less violent than those with average and above-average IQ scores. In his view, the "overwhelming majority of people who [were abused as children] will not abuse as they get older."

### III. DISCUSSION

#### A. Defendant's competence to stand trial

During pretrial proceedings, defense counsel sought to schedule a hearing "for the purpose of declaring a doubt as to the defendant's mental capacity pursuant to [section] 1368." Counsel offered no facts or observations to explain why he doubted defendant's competence. Nonetheless, "[i]n light of that representation," the trial court appointed psychologist Kathryn Davis to examine defendant and to report to the court on defendant's mental competence. The court

14

stated that it was not suspending criminal proceedings and that the appointment of Dr. Davis did not constitute the institution of a section 1369 competency trial.

According to Dr. Davis's report, she interviewed defendant on three occasions, and she administered the Rorschach inkblot test, the Minnesota Multiphasic Personality Inventory, the Millon Clinical Multiaxial Inventory, the incomplete sentence stems measure, and the Folstein mini-mental state exam. She also reviewed defendant's high school records, employment records, a summary of his custody history, and relevant grand jury transcripts. Defendant told her that, because of a learning disability, he was placed in special education classes in math, science, and history, but was "mainstreamed" in other classes. He earned mostly "C" grades and graduated from high school in 1987. She reported that defendant was able to describe the allegations against him, clearly knew the difference between a felony and a misdemeanor, and knew that the charges against him were felony charges. He was able to explain the possible sentence alternatives should he be found guilty and to discuss some plea bargaining proposals. He was able to describe the roles of the jury, the district attorney, defense counsel, the bailiff, the judge, and the witnesses. He was able to discriminate appropriate from inappropriate behavior in the courtroom. He was able to define several terms used in the courtroom. He was able to discuss working with his attorney, as well as his options if he did not feel comfortable with his attorney. He expressed a lack of interest in representing himself. He also understood the principle of attorney-client confidentiality.

Dr. Davis included in her report a form developed at Harvard Medical School entitled "Competency to Stand Trial Assessment Instrument." Using that form, she described the degree of defendant's incapacity ("none," "mild," "moderate," "severe," "total") in 13 categories of behavior relating to criminal trials. She indicated that defendant had no incapacity in (1) appraising available

15

legal defenses; (2) relating to his attorney; (3) appraising the roles of the defense counsel, the prosecuting attorney, the judge, the jury, the defendant, and the witnesses; (4) understanding the filed charges; (5) understanding the range and nature of the possible penalties; (6) appraising the likely outcome; (7) informing counsel of pertinent facts surrounding the alleged offense, including defendant's movements, timing, mental state, and actions at the time of the alleged offense; and (8) understanding the difference between self-defeating and self-serving motivations. He had mild incapacity in (1) dealing with unmanageable behavior; (2) planning legal strategy; (3) understanding court procedure; and (4) realistically challenging prosecution witnesses. Dr. Davis rated defendant as moderately incompetent in his ability to testify relevantly.

Dr. Davis concluded that defendant (1) appeared to understand the nature and purpose of the criminal proceedings; (2) could cooperate in a rational manner with counsel; and (3) did not "demonstrate a formal thought disorder" or "mental illness which would make him incapable of [re]presenting himself in a rational manner without counsel." After receiving Dr. Davis's report, the trial court denied defendant's motion to hold a competency trial under section 1369.

Defendant contends that the trial court held what was, in effect, a section 1369 competency trial but did so without suspending the criminal proceedings and without appointing the director of the regional center for the developmentally disabled to examine defendant. (See §§ 1367, 1368, 1369.) He further contends that the trial court erred in failing, during the penalty phase, to declare a doubt concerning defendant's competence to stand trial based on evidence that was then presented of defendant's intellectual disabilities. Defendant argues these asserted failings violated his statutory rights and his right to due process of law and a fair trial under the state and federal Constitutions. (See *Pate v. Robinson* (1966) 383 U.S. 375; *People v. Leonard* (2007) 40 Cal.4th 1370.) We discern no error.

16

"  'Both the due process clause of the Fourteenth Amendment to the United States Constitution and state law prohibit the state from trying or convicting a criminal defendant while he or she is mentally incompetent.  (§ 1367; *Drope v. Missouri* (1975) 420 U.S. 162, 181; *Pate v. Robinson*[, *supra*,] 383 U.S. [at pp.] 384–386; *People v. Ramos* (2004) 34 Cal.4th 494, 507.)  A defendant is incompetent to stand trial if he or she lacks a " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — [or lacks] . . . a rational as well as a factual understanding of the proceedings against him.' " (*Duskey v. United States* (196[0]) 362 U.S. 402, 402; see also *Godinez v. Moran* (1993) 509 U.S. 389, 399-400; § 1367; *People v. Stewart* (2004) 33 Cal.4th 425, 513.)' (*People v. Rogers* (2006) 39 Cal.4th 826, 846-847, brackets added herein.)" (*People v. Lewis* (2008) 43 Cal.4th 415, 524.)

"  'Both federal due process and state law require a trial judge to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial.  [Citations.] . . .  Evidence of incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations.  [Citations.]' (*People v. Rogers*, *supra*, 39 Cal.4th at p. 847.)  But to be entitled to a competency hearing, 'a defendant must exhibit more than bizarre . . . behavior, strange words, or a preexisting psychiatric condition that has little bearing on the question of whether the defendant can assist his defense counsel. [Citations.]' (*People v. Ramos*, *supra*, 34 Cal.4th at p. 508.)" (*People v. Lewis*, *supra*, 43 Cal.4th at p. 524.)

"[I]f a qualified mental health expert who has examined the defendant ' "states under oath with particularity that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of

17

the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel," ' that is substantial evidence of incompetence." (*People v. Lewis*, *supra*, 43 Cal.4th at p. 525.) But, contrary to defendant's argument, defense counsel's expressed belief that defendant might be mentally incompetent does not automatically trigger a section 1369 competency trial. "Counsel's assertion of a belief in a client's incompetence is entitled to some weight. But unless the court itself has declared a doubt as to the defendant's competence, and has asked for counsel's opinion on the subject, counsel's assertions that his or her client is or may be incompetent does not, in the absence of substantial evidence to that effect, require the court to hold a competency hearing." (*People v. Mai* (2013) 57 Cal.4th 986, 1033; see *People v. Lewis*, *supra*, 43 Cal.4th at p. 525; *People v. Pennington* (1967) 66 Cal.2d 508, 516.) "By the same token, and absent a showing of 'incompetence' that is 'substantial' as a matter of law, the trial judge's decision not to order a competency hearing is entitled to great deference, because the trial court is in the best position to observe the defendant during trial." (*Mai*, at p. 1033.)

In summary, defense counsel must present expert opinion from a qualified and informed mental health expert, stating under oath and with particularity that the defendant is incompetent, or counsel must make some other substantial showing of incompetence that supplements and supports counsel's own opinion. Only then does the trial court have a nondiscretionary obligation to suspend proceedings and hold a competency trial. (See *People v. Pennington*, *supra*, 66 Cal.2d at p. 518.) Otherwise, we give great deference to the trial court's decision not to hold a competency trial.

Here, counsel only requested a hearing on the issue of defendant's competence to stand trial. At no time, before or during trial, did the defense present substantial evidence of defendant's incapacity to stand trial, and the trial

18

court expressly stated that it was not suspending proceedings under section 1368 and holding a competency trial. Nevertheless, the trial court appointed Dr. Kathryn Davis to examine defendant.

Dr. Davis's report was the only evidence in the record concerning defendant's competence to stand trial, and it failed to establish doubt in the trial court's mind as to defendant's competence. The court therefore did not err in denying defendant's motion to suspend the criminal proceedings and to hold a formal competency trial under section 1369. (*People v. Lewis*, *supra*, 43 Cal.4th at p. 525.)

That the court appointed Dr. Davis to conduct a competency examination and that it later ruled that defendant was "competent within the meaning of 1368" did not, as defendant asserts, transform the proceeding into a section 1369 competency trial. Section 1368 states that a judge may suspend proceedings and hold a competency trial if "a doubt arises in the mind of the judge as to the mental competence of the defendant." Section 1369 sets forth the procedure for holding a competency trial. Here, although the trial court's choice of wording was not ideal, its reference to section 1368 (not section 1369) shows that it was merely stating that a "doubt" had not arisen as to defendant's competence to stand trial and therefore that a section 1369 competency trial was not required; it was not making a determination of competence under section 1369. Furthermore, without the need for a section 1369 competency trial, the court had no obligation to appoint the director of the regional center for the developmentally disabled to examine defendant. (§ 1369, subd. (a).)

Defendant asserts that the trial court, on its own initiative, should have declared a doubt about his competence to stand trial based on the mental health evidence he presented in mitigation at the penalty phase. We disagree.

19

" 'Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.' " (*People v. Lightsey* (2012) 54 Cal.4th 668, 690.)  Defendant here is correct that evidence presented at the penalty phase suggested that he had brain damage and mental disabilities as a result of car accidents his mother was involved in just before his birth.  He had low IQ scores and lifelong learning disabilities; his math, spelling, and reading skills were that of a third or fourth grader; and he had disabilities in abstract thinking, verbal skills, and the ability to execute complex tasks.  Nevertheless, defendant performed competently in various jobs and attended college-level business management courses.  Defendant fails to establish that his brain damage and mental disabilities interfered with his ability to understand the nature of the criminal proceedings or to rationally assist counsel in conducting his defense.[3]  In addition, the evidence of defendant's intellectual disability describes a long-standing condition, not a *change* in his mental competence during the course of trial.  Therefore, Dr. Davis's pretrial report remains the most persuasive evidence of defendant's competence.

Significantly, the penalty phase evidence, which addressed defendant's alleged intellectual disability, did not pertain to the question of competence to stand trial.  Although a defendant's incompetence to stand trial might, in some cases, be inferred from evidence of severe intellectual disability, the penalty phase

---

[3]    Nothing we say here addresses a potential *Atkins* claim by way of a petition for a writ of habeas corpus.  (See *Atkins v. Virginia* (2002) 536 U.S. 304, 318, 320–321 [holding that executing mentally retarded persons violates the Eighth Amendment's prohibition against cruel and unusual punishment].)

evidence of possible incompetence presented here was not so substantial as to deprive the trial court of discretion. Therefore, we defer to the trial court, which heard the penalty phase evidence, observed defendant and the witnesses, and did not form a doubt about defendant's mental competence. (*People v. Mai*, *supra*, 57 Cal.4th at p. 1033.)

### B. Denial of *Batson-Wheeler* motion

Defendant contends that the prosecutor improperly exercised a peremptory challenge to a prospective juror based on race and that the trial court later erred in overruling defendant's objection under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*). Defendant's claim lacks merit.

During jury selection, defendant, who is African-American, objected to the prosecution's use of a peremptory challenge to excuse the venire's only remaining African-American prospective juror, P.M., a college-educated schoolteacher who supported the death penalty. Defendant observed that, of all the prospective jurors in the venire, only two were African-American — P.M. and a prospective juror whom the trial court had excused for hardship. Defendant noted that P.M. was a strong supporter of the death penalty and he had assured the court that he could be fair. Defendant argued that P.M.'s support for the death penalty showed that the prosecutor's peremptory challenge was race based.

The prosecutor argued that defendant had failed to make a prima facie showing of race discrimination, and the trial court agreed. The court characterized P.M's thinking on the death penalty as "equivocal," justifying the prosecutor's use of a peremptory challenge to remove him. The court concluded that defendant had failed to show a "strong likelihood" that the prosecutor's challenge was based on race, saying: "I d[o]n't feel that a prima facie showing was made out"; "I

21

conclude that you have not made the prima facie showing"; and "I make the finding that you have not made out [a] prima facie showing . . . ."

The trial court then asked the prosecutor whether he wanted to put his reasons for challenging P.M. on the record. The prosecutor responded: "I don't want to waive the Court's finding." The court then assured the prosecutor that, by stating his reasons on the record, he would not be conceding the question of a prima facie case. Specifically, the court said: *"I have already made the finding . . . ,* so you are not waiving the Court's finding. [¶] The question I have is *notwithstanding the Court's finding*, do you wish to respond [to the claim of race discrimination] in any event?" (Italics added.) In short, the court made clear that it had made its ruling and that it was only giving the prosecutor a chance to make a contemporaneous record in the event that ruling was challenged on appeal. The prosecutor then gave his reasons, explaining: "[P.M.'s] answers don't make sense. He is a loose cannon. . . . [H]e doesn't understand the questions, he gives nonresponsive answers. [¶] . . . This is a man who supposedly has a college degree and is teaching high school . . . . But he doesn't understand simple English and doesn't respond appropriately. [¶] . . . [H]e would not understand the complexity of the case, . . . just based on his lack of understanding of certain common English words."[4]

---

**4** When P.M. was asked in the juror questionnaire if he had health problems that might affect his ability to serve as a juror, he circled the word "sight" but gave the explanation that he "cannot hear from left." He denied belonging to any group that advocates support for or abolition of the death penalty, but he apparently confused the word abolition with the word abortion, writing: "Before the the [*sic*] starts to be born, I believe in abolition." When he was later asked to elaborate, he said: "[M]y mind went back to they are talking about if somebody is pregnant and they are talking about abortions, about killing — a lot of people give

*(footnote continued on next page)*

22

After the prosecutor stated his reasons, the court said: "Very well. I have heard Counsels' views, I have considered the record, *I have made the finding*. The *Wheeler* motion is denied." (Italics added.) In other words, the court made clear that it was merely reiterating a finding it had already made.

The three-stage procedure that applies to *Batson*/*Wheeler* motions is familiar. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory

_____

*(footnote continued from previous page)*

me the opinion that if somebody is pregnant, that the baby will be killed before that time and I told them I somewhere was against abortion. That's what I was trying to put in that statement, that I don't believe in abortion during this time." When asked if he had given much thought to the death penalty before being called for jury duty, he answered: "Not really, because, see, I had to catch up with so much of my schoolwork because I am a teacher and I am so busy with the children I try to clear that first. I don't think too much about it." When asked if he could look defendant in the eye and say out loud that he voted to put him to death for his crimes, he answered: "I think in some way, because even whoever the person is, I will have to set up my mind first at the beginning with a mind witness open first — until I get all the information." When asked if he thought California was uncivilized because it has the death penalty, he answered: "That is a big question sometimes. Because sometimes I think it should be done, and if it's proven — in the United States. If somebody has actually done a lot of things and I think there is some point it should be done sometimes if something does cross my mind, and then sometimes I believe that some persons should spend the rest of their time in jail. I have never actually sit around and listened to any facts about any person that somebody — you know, media information because I am not able to make a decision before that. [] There are things that cross my mind, things you see on television and those things you listen to. And that's where my decision came from." When asked if he had knowledge of the law regarding aiding and abetting, he answered: "Um, I was — I went to a library once and they had some things printed, but I was just reading a little about it, but I need — I didn't get all of the details about it."

purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' " (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted.)

This case involves only the first of these three stages. The concurring opinion argues that when the prosecutor volunteered his reasons for challenging P.M., the issue of whether defendant established a prima facie showing of discriminatory purpose became moot, and we therefore should proceed to the third stage of the *Batson* analysis. That rule, however, applies only when *the trial court explicitly or implicitly evaluates the prosecutor's stated reasons*. (See *People v. Riccardi* (2012) 54 Cal.4th 758, 786-787; *People v. Elliott* (2012) 53 Cal.4th 535, 560-561; *People v. Mills* (2010) 48 Cal.4th 158, 174-175; *People v. Lenix* (2008) 44 Cal.4th 602, 613, fn. 8.) Here, the trial court did not evaluate the prosecutor's stated reasons, either explicitly or implicitly. Rather, the court made its finding *before* the prosecution's recitation of reasons. The court stated that its invitation to the prosecutor to give his reasons was "notwithstanding the court's finding," and the court's final words on the matter were not an express or implied comment on the prosecutor's reasons, but a reiteration, without additional analysis, that the court had already made its finding.

Those facts make this case indistinguishable from *People v. Hawthorne* (2009) 46 Cal.4th 67, 78-80, in which this court unanimously rejected a *Batson/Wheeler* claim on first-stage grounds even though, as here, the prosecutor stated her reasons for her peremptory challenges on the record. In *Hawthorne*, as here, the trial court did not evaluate the prosecutor's stated reasons, a point that this court later found to be significant (see *People v. Mills*, *supra*, 48 Cal.4th at

24

p. 174, fn. 3).  (See also *People v. Welch* (1999) 20 Cal.4th 701, 746 ["But when, as here, the trial court states that it does not believe a prima facie case has been made, and then invites the prosecution to justify its challenges for purposes of completing the record on appeal, the question whether a prima facie case has been made is not mooted, nor is a finding of a prima facie showing implied."].)  We conclude, therefore, that this case involves only the first of the three *Batson* stages:  whether defendant made out a prima facie case of racial discrimination.[5]

Nevertheless, in finding that defendant had failed to show a "strong likelihood" of discrimination, the trial court applied an inappropriately rigorous standard.  (See *Johnson v. California*, *supra*, 545 U.S. at p. 168 [rejecting the "more likely than not" standard for the prima facie showing of discrimination].)  Accordingly, we review the record independently and apply the correct standard:  " ' "whether the record supports an *inference* that the prosecutor excused a juror" on a prohibited discriminatory basis.' "  (*People v. Bonilla* (2007) 41 Cal.4th 313, 342, italics added.)

Certain types of evidence are relevant in determining whether a defendant has made a prima facie showing of race-based discrimination by the prosecution in its juror challenges.  Included in the inquiry is whether the prosecution (1) struck most or all of the members of an identifiable group from the venire, (2) used a disproportionate number of its peremptory challenges against that group, or

---

**5**      Significantly, we are not here presented with, nor have we ever been presented with, a situation in which, after the trial court found that no prima facie case had been shown, the prosecutor volunteered reasons for the peremptory challenge that were facially invalid, suggesting impermissible group bias. Nothing we say here should be understood as indicating how we would address such a situation.

(3) engaged in little more than desultory voir dire. (*People v. Bell* (2007) 40 Cal.4th 582, 597.) Defendant here argues that, at trial, he made a prima facie showing of discrimination based on the circumstance that P.M., who supported the death penalty, was the only African-American prospective juror in the venire after hardship excusals. But P.M.'s racial identity, standing alone, is not dispositive. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1101.) Moreover, the prosecutor here engaged Prospective Juror P.M. in an in-depth voir dire, covering more than five pages of transcript, in which P.M. displayed confused, rambling, and incoherent thinking. (See p. 22, fn. 4, *ante.*) A prosecutor would reasonably want to avoid having such a juror in a complex case such as a death penalty trial. When, as here, a prospective juror exhibits obvious signs of being unsuitable for the jury, the inference that the prosecutor excused the juror on an improper basis becomes less tenable and a correspondingly greater showing is required to support that inference. In light of the voir dire, the circumstance that P.M. was the only African-American on the venire does not support an inference of racial bias on the part of the prosecutor.

## C. Guilt phase issues

### 1. Autopsy and crime scene photographs

Defendant contends the trial court abused its discretion and violated his state and federal constitutional rights to due process and to a fair trial by admitting, over his objection, many crime scene and autopsy photographs. He argues the photographs were irrelevant and substantially more prejudicial than probative. (Evid. Code, §§ 350, 352.) We disagree.

Autopsy photographs of a murder victim "are always relevant at trial to prove how the crime occurred; the prosecution need not prove these details solely through witness testimony." (*People v. Carey* (2007) 41 Cal.4th 109, 127.) In

26

addition, "[s]uch photographs may . . . be relevant to prove that the killer acted with malice." (*Ibid.*) Contrary to defendant's arguments, defense counsel's concession in his opening statement to the jury that defendant shot the victim did not make the photographs irrelevant or merely cumulative. Counsel's statements were not evidence, and defendant, who pleaded not guilty, did not testify and admit that he shot the victim. The prosecution therefore had to prove its case (irrespective of defense counsel's opening statement), and the photographs were relevant evidence. (*People v. Scott* (2011) 52 Cal.4th 452, 470-471; *People v. Wilson* (1992) 3 Cal.4th 926, 938.)

Moreover, the crime scene photographs were relevant to establish the killer's mental state, an issue that defense counsel did not concede. Specifically, they supported the prosecution's assertion that the killer carried the unconscious Gonzales to the ditch, pressed the gun to her head, and shot her, actions that together suggest premeditation and deliberation. In addition, the photographs corroborated Rollins's testimony that defendant pointed to his forehead and cheek and said, "I did it right here." The photographs were also relevant to the question whether Gonzales had been kidnapped and raped before she was murdered, for defendant's own expert witness conceded that the photographs strongly suggested that a sexual assault had occurred.

Defendant argues that the photographs were graphic and gruesome and therefore the risk of undue prejudice from their admission substantially outweighed their probative value. (Evid. Code, § 352.) The trial court did not abuse its discretion in ruling otherwise. (*People v. Valdez* (2012) 55 Cal.4th 82, 133.) We have reviewed the photographs, and although they are disturbing and unpleasant, the trial court could reasonably conclude that the danger of undue prejudice from their admission did not substantially outweigh their probative value in establishing the circumstances of the murder.

27

Defendant argues that empirical studies have suggested that the introduction of gruesome photographs at trial is likely to have a dramatic effect on juries. Defendant did not raise that objection at trial, and the studies in question are not part of the trial record. Thus, the trial court was not provided an opportunity to consider the relevance of the studies in weighing the potential for undue prejudice against the probative value of the photographs.

Because the trial court did not abuse its discretion in finding the photographs relevant and not unduly prejudicial, there was no violation of defendant's constitutional rights. (*People v. Riggs* (2008) 44 Cal.4th 248, 304.)

### 2. *Accomplice corroboration*

Defendant contends that there was insufficient evidence corroborating Rollins's testimony that defendant committed the murder and that the trial court therefore erred in denying his motion, under section 1118.1, for an acquittal on that charge. He further contends that the jury's verdicts on the kidnapping charge and the kidnapping special-circumstance allegation are constitutionally invalid, again because there was insufficient evidence corroborating Rollins's testimony. These contentions lack merit.

Section 1111 provides that "[a] conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." The statute defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.) " 'To be so chargeable, the witness must be a principal under section 31. That section defines principals as "[a]ll persons concerned in the commission of a

28

crime, whether . . . they directly commit the act constituting the offense, or aid and abet in its commission . . . ." (§ 31.)  An aider and abettor is one who acts with both knowledge of the perpetrator's criminal purpose and the intent of encouraging or facilitating commission of the offense.  Like a conspirator, an aider and abettor is guilty not only of the offense he intended to encourage or facilitate, but also of any reasonably foreseeable offense committed by the perpetrator he aids and abets.'  [Citation.]  'Unless there can be no dispute concerning the evidence or the inferences to be drawn from the evidence, whether a witness is an accomplice is a question for the jury.  On the other hand, the court should instruct the jury that a witness is an accomplice as a matter of law when the facts establishing the witness's status as an accomplice are " ' "clear and undisputed." ' " ' [Citations.]" (*People v. Whalen* (2013) 56 Cal.4th 1, 58-59.)

Here, the trial court properly instructed the jury that it was required to decide whether Rollins was an accomplice.  Defendant asserts that Rollins's testimony disavowing any personal participation in the crimes against Gonzales was not credible and therefore any rational juror would have found him to be an accomplice.  Defendant also relies on an asserted concession by respondent that Rollins's testimony needed corroboration.  We disagree that respondent conceded the issue, and we conclude that the question of Rollins's accomplice status was for the jury to decide.  Rollins's role in the crimes was not beyond dispute; rather, the jury could have believed his testimony that he did not know of or intend to assist in the crimes, in which case he was not an accomplice and his testimony did not require corroboration.  In addition, even if the jury concluded that Rollins was an accomplice, it could have found that his testimony was adequately corroborated.  For example, Rollins's testimony that Jackson raped Gonzales was corroborated by autopsy evidence indicating nonconsensual sex.  Therefore, the issue of corroboration (whether corroboration was required and whether there was

adequate corroboration) was properly given to the jury to decide, and it was not the proper subject of a motion for an acquittal (§ 1118.1).

Nor does the issue of corroboration support a constitutional claim under *Jackson v. Virginia* (1979) 443 U.S. 307 (due process requirement that a conviction be based on sufficient evidence) or under *Hicks v. Oklahoma* (1980) 447 U.S. 343 (due process requirement that a conviction be obtained in accordance with state procedures if those procedures are the sort that give rise to a "liberty interest"). The federal constitutional requirement that sufficient evidence support every element of an offense does not require corroboration of accomplice testimony as a matter of course. (See *People v. Frye* (1998) 18 Cal.4th 894, 968.) In addition, because there was no violation of section 1111, defendant's constitutional right to a conviction obtained in accordance with state procedures could not have been violated (assuming § 1111 creates a liberty interest for purposes of the federal due process guarantee).

### 3. Instruction on first degree murder

Count one of the indictment charged defendant with "committing the crime of violation of section 187(a) of the Penal Code in that . . . he did willfully, unlawfully, and with malice aforethought murder Genoveva Gonzales." The indictment was silent as to the degree of murder charged. Defendant argues, however, that he was charged with second degree malice murder, and therefore the court erred in instructing the jury on first degree murder. He asserts that jurisdiction over and adequate notice of a charge of first degree murder were lacking.

As defendant acknowledges, this court has previously rejected identical claims. (*People v. Tate* (2010) 49 Cal.4th 635, 696-697 [defendant may be convicted of first degree murder even though the indictment or information

30

charges only murder with malice in violation of § 187]; *People v. Hughes* (2002) 27 Cal.4th 287, 288 [an accusatory pleading charging a defendant with murder need not specify the theory of murder on which the prosecution intends to rely]; *Hughes*, at pp. 369-370 [the accused received adequate notice of the prosecution's theory of the case from the testimony presented at the indictment proceeding]; *People v. Abel* (2012) 53 Cal.4th 891, 937-938 [pleading referring only to § 187, subd. (a) provides adequate notice of possible conviction on a felony-murder theory]; *People v. Famalaro* (2012) 52 Cal.4th 1, 37 [*Apprendi v. New Jersey* (2000) 530 U.S. 466 does not require that the charging document specifically plead first degree murder].)  We see no reason to revisit those conclusions.

### 4. *Instruction on motive*

Defendant contends that the trial court's jury instruction on evidence of motive (CALJIC No. 2.51) was erroneous because the jury could have interpreted it as permitting a conviction based *solely* on such evidence.  Assuming that this claim affects defendant's substantial rights and therefore that we may address the claim on the merits despite defendant's failure to object at trial (§ 1259),[6] this court has consistently rejected the claim, and defendant presents no reason for us to adopt a different course here.  (*People v. Livingston* (2012) 53 Cal.4th 1145, 1168; *People v. Snow* (2003) 30 Cal.4th 43, 97-98.)  Defendant also argues that the instruction reduced the prosecutor's burden of proof by requiring defendant to prove *the absence of* a motive in order to establish his innocence.  Again assuming

---

**6**    Section 1259 provides in relevant part that an appellate court may "review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."

that this claim, which was not raised below, affects defendant's substantial rights and is therefore reviewable (§ 1259), we reject the claim on the same basis that we have rejected it in the past. (*People v. Crew* (2003) 31 Cal.4th 822, 841-842.)

### 5. Instruction on kidnapping

At trial, defendant challenged the kidnapping charge and the kidnapping-murder special-circumstance allegation on the ground that the prosecution had not proved the absence of consent, arguing that the evidence suggested that Gonzales *willingly* went with defendant and Jackson to exchange sex for drugs. He argues on appeal that the trial court's instruction on consent (CALJIC No. 9.56) was misleading. He also argues that the assertedly erroneous instruction violated his constitutional rights to a trial by jury, to have every element of the crime proved beyond a reasonable doubt, and to a fair trial. Defendant failed to object in the trial court, but to the extent he is claiming that the instruction was erroneous (and not merely that the court should have clarified certain terms within it), his claims are reviewable under section 1259. (See *People v. Whalen*, *supra*, 56 Cal.4th at pp. 81-82 [" 'failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal' "].) We conclude that the trial court here did not err.

The relevant inquiry here is whether, "in the context of the instructions as a whole and the trial record, there is a reasonable likelihood that the jury was misled to defendant's prejudice." (*People v. Pollock* (2004) 32 Cal.4th 1153, 1189.) Also, " ' "we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' " (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1321.)

The trial court here instructed the jury on the definition of kidnapping, in the language of CALJIC No. 9.50: "Every person who unlawfully and with

32

physical force or by any other means of instilling fear steals, takes, or holds, detains or arrests another person and carries such person without her consent for a substantial distance, that is, a distance more than slight or trivial, is guilty of the crime of kidnapping in violation of Penal Code Section 207(a). In order to prove such crime, each of the following elements must be proved: One, a person was unlawfully moved by the use of physical force, or by any other means of instilling fear; . . . Two, the movement of such person was without her consent; and Three, the movement of such person was for a substantial distance, that is, a distance more than slight or trivial."

Thereafter, the trial court here explained the meaning of consent, in the language of then-worded CALJIC No. 9.56: "When one consents to accompany another, there is no kidnapping so long as such condition of consent exists. To consent to an act or transaction, a person must: One, act freely and voluntarily and not under the influence of threats, force, or duress; Two, have knowledge of the true nature of the act or transaction involved; and Three, possess sufficient mental capacity to make an intelligent choice whether or not to do something proposed by another person. Mere passivity does not amount to consent. Consent requires a free will and positive cooperation in act or attitude."

Defendant asserts that the consent instruction was misleading because the jury may have interpreted the phrase "have knowledge of the *true nature* of the act" (italics added) to require that the victim not only knew that she was being moved but also knew *the intention* of the people who moved her. According to defendant, the jury here might have found that Gonzales did not consent to going with Jackson and defendant, because she did not know that they intended to move her in order to rape or kill her. In other words, the jury may have found that she was *tricked* into accompanying Jackson and defendant, and it may have wrongly believed that such trickery could support a kidnapping finding.

33

It is true that " 'asportation by fraud alone does not constitute general kidnapping in California.' " (*People v. Majors* (2004) 33 Cal.4th 321, 327.)  This court has, however, in past decisions explained that, although the version of CALJIC No. 9.56 given here is "not well-worded," it nonetheless correctly states the law.  (*People v. Davis* (1995) 10 Cal.4th 463, 517.)[7]  "The phrase 'act or transaction,' which appears twice in the instruction, refers to the earlier phrase 'to accompany another.'  Thus 'knowledge of the true nature of the act or transaction involved' refers to the act or transaction of accompanying another, i.e., physical asportation."  (*Ibid.*)  We reject defendant's claim that *Davis* was wrongly decided on this point, and defendant has not persuaded us that *Davis* can be distinguished.

Defendant next claims that CALJIC No. 9.56 was misleading in its final two sentences, which said:  "Mere passivity does not amount to consent.  Consent requires a free will and positive cooperation in act or attitude."  Defendant argues that these sentences set the consent threshold too high, making it easier for the jury to find an absence of consent (and thus a kidnapping).  He asserts that the jury may have concluded that Gonzales actually subjectively consented to going with Jackson and defendant but that it may have nevertheless found a kidnapping because Gonzales did nothing that amounted to "positive cooperation."

The most natural understanding of the sentences at issue is to clarify that consent must be an exercise of "a free will."  Thus, one who is unable to form any preference at all (perhaps due to unconsciousness or intoxication) is not consenting by way of passivity.  Rather, a person who consents must exhibit some

---

[7]     CALJIC No. 9.56 has since been modified.  The phrase "have knowledge of the true nature of the act or transaction involved" was replaced by the phrase "[h]ave knowledge that [he][she] was being physically moved."

"positive cooperation in act or *attitude*." (Italics added.) We discern no error in the instruction. A person who is conscious and able to make a choice can express consent merely by being cooperative in attitude, but if Gonzales exhibited no positive cooperation *even in attitude*, then, despite her passivity, she was not consenting. Kidnapping does not require that the victim express some form of protest or resistance.

Defendant's third assertion focuses on the statement in CALJIC No. 9.56 that the consenting person must "act freely and voluntarily and not under the influence of threats, force, or duress." The trial court here did not clarify for the jury that "ordinarily the force element [of kidnapping] . . . requires something more than the quantum of physical force necessary to effect movement of the victim from one location to another." (*In re Michelle D.* (2002) 29 Cal.4th 600, 605-606.) Defendant asserts that, by not clarifying the quantum of physical force necessary to vitiate consent, the jury instruction in question erroneously permitted the jury here to find the absence of consent based only on slight force, such as the force that would have been involved in helping the victim into the car. The consent instruction as a whole, however, conveyed to the jury that the required force must be enough that the victim's acts were not free and voluntary, and the prosecutor did not argue otherwise to the jury. Therefore, the trial court did not err in giving the instruction at issue.

### 6. *Instruction on voluntary manslaughter*

Defendant contends the trial court erred in denying his request to instruct the jury on voluntary manslaughter as a lesser included offense of murder. We disagree.

"[A] trial court must give ' " 'instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged

35

offense were present [citation], but not when there is no evidence that the offense was less than that charged.' " ' [Citation.] 'As our prior decisions explain, the existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury. [Citations.] "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[]' " that the lesser offense, but not the greater, was committed.' [Citation.]" (*People v. Romero* (2008) 44 Cal.4th 386, 402-403.)

Defendant asserts that the jury could have concluded that he was guilty of voluntary manslaughter, but not murder, if it found that he was acting under duress when he shot and killed Gonzales. But this court has long held that duress cannot reduce murder to manslaughter, and defendant does not convince us otherwise. (*People v. Hinton* (2006) 37 Cal.4th 839, 882-883; *People v. Anderson* (2002) 28 Cal.4th 767, 781.)

To the extent defendant also asserts that the jury could have found him guilty of voluntary manslaughter on the theory that he shot Gonzales in a sudden quarrel or heat of passion, we also reject that claim. The record contains no substantial evidence that defendant's reason " 'was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' " (*People v. Barton* (1995) 12 Cal.4th 186, 201.) In arguing to the contrary, defendant points to his sister Lydia's testimony regarding a conversation between Rollins and defendant. According to Lydia, Rollins had told defendant to "smoke" Gonzales and added that "if he didn't smoke her, he [Rollins] was going to smoke her and him." She also testified that "in her opinion, defendant was afraid of Rollins." This testimony

36

that defendant might have acted out of fear of *one of his cohorts*, not fear of the victim, does not provide substantial evidence to support a finding of heat-of-passion voluntary manslaughter. (See *People v. Steele* (2002) 27 Cal.4th 1230, 1253 [the "objective, reasonable person requirement" of heat-of-passion voluntary manslaughter "requires provocation by the victim"].)

### 7. *Instruction on unjoined perpetrators*

The trial court instructed the jurors with the unmodified version of CALJIC No. 2.11.5: "There has been evidence in this case indicating that a person other than defendant was or may have been involved in the crime for which the defendant is on trial. [¶] There may be many reasons why such person is not here on trial. Therefore, do not discuss or give any consideration to why the other person is not being prosecuted in this trial or whether he has been or will be prosecuted. Your duty is to decide whether the people have proved the guilt of the defendant on trial." Defendant contends that the court's failure to modify the instruction to exclude prosecution witness Rollins from its scope constituted error. Assuming that we may review defendant's challenge despite his failure to object at trial (§ 1259), we conclude the court's instructions as a whole were not erroneous.

We agree with defendant that, ideally, the trial court should have modified CALJIC No. 2.11.5 to make clear that it applied *only* to Jackson and that it did not preclude the jury from taking into consideration, for purposes of evaluating Rollins's credibility, the reason that Rollins was not on trial (his having been granted immunity in exchange for his testimony as a prosecution witness). As this court has consistently concluded, however, the failure to modify the standard instruction in these circumstances is not error, because " ' "[w]hen the instruction is given with the full panoply of witness credibility and accomplice instructions,

as it was in this case, [jurors] will understand that although the separate prosecution or nonprosecution of coparticipants, and the reasons therefor, may not be considered on the issue of the charged defendant's guilt, a plea bargain or grant of immunity may be considered as evidence of interest or bias in assessing the credibility of prosecution witnesses." ' " (*People v. Lawley* (2002) 27 Cal.4th 102, 162.)

### 8. *Instructions on burden of proof*

Defendant next argues that a series of standard jury instructions — CALJIC Nos. 1.00, 2.01, 2.10, 2.22, 2.27, 2.51, 2.90 and 8.20 — improperly described the process of assessing his guilt, diminished the prosecution's burden of proof, and placed a burden of proving innocence upon the defense. He also points to instances during voir dire when the trial court or the prosecutor used the word "innocence" to refer to what the jury would need to determine. This court has consistently rejected these and similar challenges, and we do so again here. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 220-221.) The court's instruction per CALJIC No. 2.90 at the conclusion of the guilt phase properly defined the prosecution's burden.

### 9. *Instruction on unanimity with regard to the theory of first degree murder*

Defendant contends the trial court erred in failing to instruct the jury, on its own motion, that the jurors were required to agree unanimously on whether defendant committed premeditated murder or murder in the perpetration of rape and kidnapping. This court has repeatedly rejected this claim. Premeditated murder and felony murder are not distinct crimes; rather, they are alternative theories of liability, and jurors need not unanimously agree on a particular theory of liability in order to reach a unanimous verdict. (*People v. Benavides* (2005) 35 Cal.4th 69, 101.)

*10. Instruction on second degree murder*

Defendant asks us to reconsider our long-standing rejection of challenges to the "acquittal first" rule embodied in CALJIC No. 8.75. That rule directs the jury that it must first unanimously acquit the defendant of the greatest offense (here, first degree murder) before it considers whether to find him guilty of a lesser offense (here, second degree murder). (See *People v. Whisenhunt*, *supra*, 44 Cal.4th at pp. 222-223; *People v. Nakahara* (2003) 30 Cal.4th 705, 715.) We decline to reconsider our past conclusion on this issue. The trial court here did not err by giving this instruction.

**D. Penalty phase issues**

*1. Victim impact evidence from prior violent crimes*

Factor (b) of section 190.3 permits the jury to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." The trial court admitted, over defendant's objection, testimony of the victims of the 1991 Oxnard Beach robbery and rape, describing how those crimes affected their lives. Defendant argues that the court erred by admitting this victim impact evidence under factor (b). This court has rejected that argument (see, e.g., *People v. Jones* (2012) 54 Cal.4th 1, 72-73; *People v. Holloway* (2004) 33 Cal.4th 96, 143-144), and defendant presents no compelling reason for us to reconsider those decisions.

*2. Prosecution's closing argument*

Defendant contends that the prosecutor committed several instances of misconduct under both the federal and state Constitutions during closing arguments to the jury. We disagree.

" 'Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such " 'unfairness as to make

the resulting conviction a denial of due process.' " ' " (*People v. Thomas* (2012) 54 Cal.4th 908, 937.) "Under California law, a prosecutor commits reversible misconduct during the penalty phase if he or she makes use of 'deceptive or reprehensible methods' in attempting to persuade either the trial court or the jury, and there is a reasonable possibility that without such misconduct, an outcome more favorable to the defendant would have resulted." (*People v. Riggs*, *supra*, 44 Cal.4th at p. 315.) " 'To preserve a misconduct claim for review on appeal, a defendant must make a timely objection and ask the trial court to admonish the jury to disregard the prosecutor's improper remarks or conduct, unless an admonition would not have cured the harm.' " (*People v. Thomas*, *supra*, 54 Cal.4th at p. 937.)

### *a. Comments regarding defendant's future dangerousness*

Defendant contends that the prosecutor improperly suggested to the jury that he would be a danger to guards and other prisoners if sentenced to life without parole. He points specifically to the prosecutor's statements that defendant "has spent his whole adult life as a predator" and that "no one within the confines of the Department of Correction will be safe with that man as a prisoner." The trial court sustained defendant's objections to these statements and admonished the jury to disregard them. The prosecutor also stated that if defendant were executed, "no one else will have to fall victim to [his crimes] again." Defendant did not object to the latter statement, and therefore, as to it, he forfeited any claim of error. In any event, "[t]he prosecution may argue future dangerousness if the argument is based on the evidence." (*People v. Harris* (2005) 37 Cal.4th 310, 358.) Here, defendant's jailhouse letters to Rollins included threats to kill him, thus supporting the prosecutor's statements that defendant exhibited a propensity for future dangerousness in prison.

40

### b. *Comments regarding the needs of society*

The prosecutor argued to the jury: "[A]s a society we must redress the outrage for [the pain and sorrow suffered by Gonzales' survivors]. We must have closure so that we feel secure knowing that justice is served and not one more person will fall victim to Chris Sattiewhite. That is what we need as a society." Defendant argues that these comments violated *Caldwell v. Mississippi* (1984) 472 U.S. 320, 328-329 (*Caldwell*) by allowing the jurors to shift the responsibility for the appropriate punishment from themselves as individuals to society at large.

Defendant's failure to object at trial does not preclude him from raising this issue on appeal. (*People v. Moon* (2005) 37 Cal.4th 1, 17 [in trials held before the finality of *People v. Cleveland* (2004) 32 Cal.4th 704, a failure to object at trial does not forfeit a claim of prosecutorial misconduct based on *Caldwell*].) We are not, however, persuaded that the prosecution's comments constituted misconduct. The comments reminded the jurors that they and the victim's family were members of the society as a whole, and the comments accurately described the jurors as the conscience of the community. (See *People v. Zambrano* (2007) 41 Cal.4th 1082, 1177-1178.) The comments did not urge the jury to abrogate their personal responsibility to determine the appropriate punishment, nor did the comments suggest to the jury that "the responsibility for determining the appropriateness of the defendant's death rests elsewhere" (*Caldwell*, *supra*, 472 U.S. at p. 329). Further, the trial court instructed the jurors that in assessing punishment, they were not to be swayed by public opinion or public feelings. The court added: "[E]ach juror must make an individualized evaluation of each fact or circumstance offered in mitigation. Each juror must make his or her own individual assessment of the weight to be given such evidence. Each juror should weigh and consider such matters regardless of whether or not they are accepted by other jurors."

Defendant further contends that the prosecutor's comments improperly appealed to the jurors' passions and emotions by implying that only a death verdict would ensure the survival of prison guards and society as a whole. Defendant failed to object in the trial court, and thus he did not preserve this issue for appeal. In addition, the claim has no merit. We are not convinced that the prosecutor's comment that society needed closure in this case to feel secure caused an emotional rather than a reasoned determination of punishment. (See *People v. Leonard*, *supra*, 40 Cal.4th at p. 1418.)

### c. *Comments assertedly influencing the jurors' emotions*

Defendant contends that the prosecutor impermissibly sought to inflame the emotions of the jurors by discussing the "king of the hill" status defendant would have in prison if he were sentenced to life without the possibility of parole and by comparing that status to Gonzales's loss of her life and the pain her family would experience as a result. Defendant did not object to this argument at trial, and therefore he failed to preserve this claim for appeal. (*People v. Lewis*, *supra*, 43 Cal.4th at p. 503.) In any event, the claim lacks merit.

Defendant first challenges the prosecutor's references to Gonzales's family visiting her grave. The prosecutor said: "And although [defendant's] sister[s] said they would rather visit him in prison than in a graveyard, think about what the Gonzales family does every Sunday after church. They bring their mother flowers at the cemetery." This argument addressed the permanence of the loss caused by defendant's crimes and fell within the considerable leeway given for argument at the penalty phase. (*People v. Sanders* (1995) 11 Cal.4th 475, 551.) It was not misconduct.

Defendant argues that the prosecutor's invitation to the jurors to compare the lives of Gonzales's family members with that of defendant in prison

42

constituted a prohibited use of victim impact evidence under *Payne v. Tennessee* (1991) 501 U.S. 808.  As defendant notes, the high court in that case explained that "victim impact evidence is not offered to encourage comparative judgments . . . ." (*Id*. at p. 823.)  Defendant, however, ignores the remainder of the high court's statement, which made clear that the "comparative judgments" that the high court disapproved were not those between the victim's family and the defendant, but those between different victims, "for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not." (*Ibid*.)  The prosecutor's argument juxtaposing Gonzales's loss of life and the effect of that loss on her family against the continuing life defendant would have in prison was neither improper nor overly emotional. (*People v. Leonard*, *supra*, 40 Cal.4th at pp. 1418-1419.)

### 3. *Instruction on the definition of life without the possibility of parole*

Defendant contends that the trial court erred by refusing to give this requested instruction:  "[L]ife without the possibility of parole means exactly what it says — the defendant will be imprisoned for the rest of his life.  For you to conclude otherwise would be to rely on conjecture and speculation and would be a violation of your oath as trial jurors."  Contrary to defendant's assertion, CALJIC Nos. 8.84 and 8.88, both of which were given here, adequately informed the jury of defendant's ineligibility for parole if not sentenced to death.  (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 203-207; *People v. Martinez* (2003) 31 Cal.4th 673, 698-699.)  Defendant's proposed instruction was therefore unnecessary.

### 4. *Instruction on the burden of proof with regard to factors in aggravation*

Defendant claims the trial court erred by refusing his request to instruct the jury that it must find aggravating factors proved beyond a reasonable doubt before using those factors to reach its sentencing decision.  This court has previously

43

rejected that assertion. "The jury at the penalty phase 'need not . . . find beyond a reasonable doubt than an aggravating circumstance is proved (except for other crimes).' " (*People v. Romero*, *supra*, 44 Cal.4th at p. 428.) The high court's decisions in *Cunningham v. California* (2007) 549 U.S. 270, *United States v. Booker* (2005) 543 U.S. 220, *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 536 U.S. 584, and *Apprendi v. New Jersey*, *supra*, 530 U.S. 466, do not affect our conclusion. (*Romero*, *supra*, 44 Cal.4th at p. 429.)

### 5. *Instruction on victim impact evidence*

Defendant contends that the trial court erred in refusing his proffered jury instructions on (1) the appropriate standard for evaluating victim impact evidence and (2) the jury's assessment of defendant's background. The court did not err.

Defendant requested that the trial court give this instruction: "Evidence has been introduced in this case that may arouse in you a natural sympathy for the victim or the victim's family. [¶] You must not allow such evidence to divert your attention from your proper role in deciding the appropriate punishment in this case. [¶] You may not impose the penalty of death as a result of an irrational, purely emotional response to this evidence." The court refused to give the proposed instruction, but it did give CALJIC No. 8.84.1, as follows: "You must neither be influenced by bias or prejudice against the defendant nor swayed by public opinion or public feelings. Both the people and the defendant have a right to expect that you will consider all of the evidence, follow the law, exercise your discretion conscientiously and reach a just verdict." Defendant argues the court's instruction failed to inform the jurors of their obligation not to allow emotion to reign over reason.

To the extent defendant's proposed instruction correctly stated the law, the trial court properly rejected it as duplicative of the standard instruction that the

court gave, and to the extent it suggested to the jury that emotion and sympathy could play no role in their deliberations, the court properly rejected it as misleading. (See *People v. Zamudio* (2008) 43 Cal.4th 327, 368-369.)

Defendant also contends the trial court erred by refusing this proposed instruction: "Evidence has been presented of defendant's lifestyle or background. You cannot consider this evidence as an aggravating factor, but may consider it only as a mitigating factor." The proposed instruction was incorrect, given that defendant's violent and criminal "background" are aggravating factors under section 190.3, factors (b) and (c). (See *People v. Riggs*, *supra*, 44 Cal.4th at p. 328, fn. 42.) Moreover, this court has repeatedly held that there is no need to supplement the standard jury instructions in order to identify which factors are aggravating and which are mitigating or to tell the jury that mitigating factors can be considered only in mitigation. (*People v. Fuiava* (2012) 53 Cal.4th 622, 732-733.)

### 6. *External pressures assertedly affecting jurors' deliberations*

Defendant contends that the trial court erred by failing to take steps to ensure that the jury's deliberations were not affected by out-of-court commitments or other personal concerns of several of the jurors. We are not persuaded.

On Wednesday, March 23, 1994, the second day of penalty phase deliberations, the court received this note from Juror No. 7: "My uncle died and the funeral is Friday [at] 10:30. I would like to be excused for this day, Friday." The foreperson also submitted a note asking "to have Friday, March 25, 1995, off so that the juror may attend the funeral for her uncle." After consulting with counsel, the trial court responded to the notes in writing: "The court has granted this request. In the event the jury has not reached a verdict by the close of the day

45

on Thursday, [March 24, 1994,] the jury will recess their deliberations at that time and will resume deliberations on Monday morning, March 28th[, 1994]."

Later that day, the trial court received a second note from the jury foreman detailing other time-related concerns of members of the jury. Juror No. 3 had a job promotion test of unknown duration starting on Tuesday, March 29, 1994. Juror No. 8 had a work-related conference in Las Vegas also beginning on March 29. Finally, Juror No. 4 informed the court that she was using vacation time from her work in order to attend the proceedings. Again after consulting with counsel, the court responded to the jury in writing, saying that it would "not take a position on these requests at this time." The court added that "[i]n the event the jury has not arrived at a verdict by midafternoon on Monday, [the court would] consider these requests at that time."

The next day, the foreperson sent the trial court another note, asking whether it could make a decision on Juror No. 8's request to attend the Las Vegas business conference so that her travel arrangements could be addressed. The court consulted with counsel and then informed the jury in writing that it would not recess the proceedings to allow her to attend the conference, although it would assist her, if possible, in seeking refunds for airplane tickets.

Later in the afternoon of Thursday, March 24, 1994, the foreperson sent yet another note, asking: "If we are unable to reach a unanimous decision either way, what will happen?" The trial court consulted with counsel and advised the jury in writing that it was "not to be concerned with what will happen should the jury be unable to arrive at a verdict."

The jury recessed at the end of the day on Thursday, March 24, 1994. It resumed deliberations on Monday, March 28, 1994, and arrived at a penalty verdict at 11:52 a.m. that day.

46

At trial, defendant never expressed concern that the trial court's handling of the jurors' notes and requests would improperly pressure the jury to reach a verdict without full deliberations, and he did not object to the trial court's responses to Juror Nos. 3, 4, and 8. He agreed with the court that their requests were premature, and he did not suggest that any of them should be excused. Defendant has therefore forfeited his claims. (*People v. Lucas* (1995) 12 Cal.4th 415, 488-489.) In any event, the claims lack merit.

Section 1089 provides in relevant part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged . . . ." "The . . . ultimate decision whether to retain or discharge a juror[] rests within the sound discretion of the trial court. [Citation.] If any substantial evidence exists to support the trial court's exercise of its discretion pursuant to section 1089, the court's action will be upheld on appeal." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1351.) "The juror's inability to perform must appear as a 'demonstrable reality' and will not be presumed." (*People v. Lucas*, *supra*, 12 Cal.4th at p. 489.)

Defendant's speculation that the jurors' personal concerns could have affected the thoroughness of the jury's deliberations does not establish that the trial court erred by failing to question the jurors on the subject or to excuse any juror under section 1089. This court concluded there was no abuse of discretion in *People v. Beeler* (1995) 9 Cal.4th 953, 986-991, where, after two days of deliberations, the jury returned a verdict less than an hour after being told that the court would recess proceedings for nearly a week to accommodate a juror's need to attend a funeral. (*Id*. at pp. 997-998.) Here, nothing in the trial court's handling of the jurors' concerns could have been interpreted by the jury as

47

suggesting that the court would limit the duration of the deliberations or that it believed only desultory deliberation was necessary to resolve defendant's case.

### E. Posttrial issues

#### *1. Motion for new trial based on newly discovered evidence*

Defendant claims that the trial court erred in denying his motion for a new trial, which was based on the prosecution's asserted failure to timely disclose evidence that members of the victim's family opposed the imposition of the death penalty. Defendant sought to introduce the family's views under section 190.3, factor (k), which permits the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

According to the probation officer's report, which was not disclosed to defendant until after the trial, Gonzales's mother and son said that they believed God would punish defendant and that they therefore did not "want to see another death," implying that they did not believe defendant should be sentenced to death. Defendant argued in his new trial motion, as he does on appeal, that the prosecution's failure to disclose this information to the defense before the end of the trial violated its duty, under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*), to disclose material exculpatory evidence. Defendant further argued that the prosecutor committed misconduct by calling for the death penalty for the sake of a family that the prosecutor knew did not want it.

The trial court properly denied defendant's new trial motion because any evidence regarding the views of Gonzales's mother and son as to the appropriate punishment was irrelevant and inadmissible. "The views of a crime victim . . . regarding the proper punishment has no bearing on the defendant's character or record or any circumstance of the offense." (*People v. Smith* (2003) 30 Cal.4th

48

581, 622; see *People v. Williams* (2008) 43 Cal.4th 584, 643; *People v. Lancaster* (2007) 41 Cal.4th 50, 98-99.)  Because the evidence at issue here was not material, the prosecution's failure to disclose it did not violate *Brady*, *supra*, 373 U.S. 83.  (See *In re Sassounian* (1995) 9 Cal.4th 535, 543-544.)  Similarly, the evidence that Gonzales's mother and son opposed the death penalty for defendant did not render improper the prosecutor's argument seeking the death penalty for their sake.  Nor was defendant improperly deprived of rebuttal evidence. (*Lancaster*, at p. 99 ["The gravity of defendant's crime was not extenuated by his victim's idealism."].)

### 2. *Application to modify verdict*

Defendant next claims that the trial court improperly considered the probation report, defendant's lack of remorse, and victim impact evidence from the Oxnard Beach crimes when ruling on the automatic application to modify the verdict under section 190.4, subdivision (e).  Defendant did not object at trial and therefore did not preserve these claims for appeal.  Even if he had done so, however, they lack merit.

### a. *Probation report*

In ruling on the application to modify the verdict, the trial court indicated that it had reweighed all the evidence and had looked at the totality of the circumstances surrounding the commission of the crime.  Immediately after declining to modify the verdict, the court said:  "I have read and considered the report of the probation officer which I now order filed and received in evidence by reference."  The court then pronounced the judgment of death.

Defendant argues that the trial court erroneously considered information contained in the probation report when ruling on the application to modify the verdict.  (See *People v. Navarette* (2003) 30 Cal.4th 458, 526 [in ruling on an

49

application to modify the verdict, the trial court may only rely on evidence that was before the jury].)  Here, however, the trial court considered the application in the same hearing as it imposed the judgment and sentence, and the record reveals only that, *in preparation for sentencing*, it read the probation report.  Although the preferred procedure for the court is to rule on the application to modify the verdict before reading the probation report, defendant's claim fails because nothing in the record suggests that the court relied on any information contained in the probation report when ruling on the application.  (*Ibid.*)

### b.  Remorse

In its ruling on the application to modify the verdict, the trial court said: "The court has not heard, nor has the jury heard, any remorse on the part of the defendant."  Defendant asserts that the court drew an improper negative inference from his failure to testify, in violation of his constitutional right to remain silent. The trial court's statement was ambiguous; it is unclear whether the court's comment referred to defendant's *failure to testify* as to his remorse or to the absence of *other evidence* of defendant's remorse.  (See *People v. Holt* (1997) 15 Cal.4th 619, 691 [prosecutor could properly comment on the defendant's lack of remorse when the statement was directed to the defendant's opportunities to express remorse in out-of-court statements and when it did not identify lack of remorse as an aggravating factor].)  Even if we assume the court improperly considered defendant's failure to testify in ruling on the application to modify the verdict, the error was harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 36) in light of the egregious nature of the Oxnard Beach rape and the rape and murder of Gonzales.

### c. *Victim impact evidence from prior violent crimes*

In its ruling on the application to modify the verdict, the trial court explained its reweighing of the mitigating and aggravating evidence. The court specifically referred to the Oxnard Beach robbery and rape and the ongoing trauma suffered by the victims of that crime, calling it a "classic nightmare." In arguing that the court erred by considering this evidence, defendant revisits his argument that victim impact evidence related to prior violent crimes is inadmissible under section 190.3, factor (b). Because — as this court has concluded — the evidence was properly admitted (see *People v. Jones*, *supra*, 54 Cal.4th at pp. 72-73), the trial court did not err in considering it.

### F. Challenges to the death penalty

#### 1. *California's death penalty statute and international norms*

Defendant contends the imposition of the death penalty violates his rights to life, to be tried before an impartial tribunal, to access to the courts, to protection against prosecutorial misconduct, and to a fair hearing as protected by international law and treaties to which the United States is a signatory, including the International Covenant on Civil and Political Rights and the Universal Declaration of Human Rights. We disagree. "International law does not prohibit a sentence of death when, as here, it was rendered in accordance with state and federal constitutional and statutory requirements. (See *People v. Alfaro* (2007) 41 Cal.4th 1277, 1332; *People v. Cornwell* (2005) 37 Cal.4th 50, 106; *People v. Harris*, *supra*, 37 Cal.4th at p. 366.)" (*People v. Hamilton* (2009) 45 Cal.4th 863, 961.) "To the extent defendant challenges the death penalty itself as violative of international norms, we again reject this claim as we have done repeatedly and consistently in other cases." (*Ibid.*)

## 2. *Constitutionality of California's death penalty statute*

Defendant raises a number of constitutional challenges to California's death penalty law, claims this court has repeatedly rejected. We find no persuasive reason to reexamine those decisions.

"Section 190.2 adequately narrows the class of murder for which the death penalty may be imposed [citation], and is not overbroad, either because of the sheer number and scope of special circumstances which define a capital murder, or because the statute permits imposition of the death penalty for an unintentional felony murder [citation]." (*People v. Harris*, *supra*, 37 Cal.4th at p. 365.)

"Consideration of the circumstances of the crime under section 190.3, factor (a), does not result in arbitrary or capricious imposition of the death penalty." (*People v. Hamilton*, *supra*, 45 Cal.4th at p. 960.)

"California death penalty law is not unconstitutional for failing to impose a burden of proof — whether beyond a reasonable doubt or by a preponderance of the evidence — as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, and the appropriateness of a death sentence. ([Citation]; see also *People v. Morrison* (2004) 34 Cal.4th 698, 731 [neither *Apprendi v. New Jersey*, *supra*, 530 U.S. 466, nor *Ring v. Arizona*, *supra*, 536 U.S. 584, warrants reconsideration of our conclusion that the death penalty statute is not unconstitutional for failing to provide the jury with instructions on the burden of proof].)" (*People v. Hamilton*, *supra*, 45 Cal.4th at p. 960.)

"The jury is not constitutionally required to achieve unanimity as to aggravating factors. [Citations.] Recent United States Supreme Court decisions in *Apprendi v. New Jersey*, *supra*, 530 U.S. 466, and *Ring v. Arizona, supra*, 536 U.S. 584, have not altered these conclusions." (*People v. Hamilton*, *supra*, 45 Cal.4th at p. 960.)

"The jury need not unanimously consider unadjudicated criminal activities as factors in aggravation, but such criminal activities can be considered only if deemed true beyond a reasonable doubt." (*People v. Harris*, *supra*, 37 Cal.4th at p. 366.)

CALJIC No. 8.88 does not improperly instruct the jury that a verdict of death is required if the factors in aggravation outweigh the factors in mitigation. (*People v. Arias* (1996) 13 Cal.4th 92, 170-171.) The jury need not be instructed to presume that a sentence of life without the possibility of parole is the appropriate sentence. (*Id*. at p. 190.)

"A jury in a capital case need not make written findings." (*People v. Hamilton*, *supra*, 45 Cal.4th at p. 960.)

The use of restrictive adjectives in section 190.3's factor (d) does not render the statute unconstitutional. (*People v. Whisenhunt*, *supra*, 44 Cal.4th at p. 228.)

"The absence of intercase proportionality review does not violate the Eighth and Fourteenth Amendments to the United States Constitution." (*People v. Whisenhunt*, *supra*, 44 Cal.4th at p. 227.)

The trial court is not required to identify which factors are aggravating and which are mitigating or to "restrict the jurors' consideration of the evidence in this regard." (*People v. Brown* (2004) 33 Cal.4th 382, 402.)

"California's death penalty statute does not violate equal protection by denying capital defendants certain procedural safeguards, such as jury unanimity and written jury findings, while affording such safeguards to noncapital defendants." (*People v. Watson* (2008) 43 Cal.4th 652, 703-704.)

## G. Cumulative prejudice

Finally, defendant argues that, even if no single error warrants reversal of the penalty verdict, the cumulative effect of all the errors necessitates reversal. We have found only one possible error (the trial court's comment on defendant's

lack of remorse), and therefore defendant's cumulative error argument is without merit.

## IV. CONCLUSION

The judgment of death is affirmed.


KENNARD, J.*

WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
WERDEGAR, J.
CHIN, J
CORRIGAN, J.

---

\*     Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING OPINION BY LIU, J.**


I agree with the court's rejection of defendant's claim under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) that the prosecutor's strike of Prospective Juror P.M. was racially motivated. But I disagree with the court's reasoning.

After defense counsel objected to the prosecutor's strike of P.M., the trial court, at the first stage of *Batson*'s three-stage analysis, found that no prima facie case of discrimination had been shown. The trial court nevertheless invited the prosecutor to state his reasons for the strike. The prosecutor accepted the invitation and gave his reasons. After hearing the reasons, the trial court denied the *Batson* motion apparently on the basis of its initial finding that defendant had made no prima facie showing of discrimination.

Today's opinion disposes of defendant's claim at the first stage of the *Batson* inquiry, even though the prosecutor stated his actual reasons for the strike. In so doing, the court opts to *hypothesize* why the prosecutor would have wanted to strike P.M. (maj. opn., *ante*, at p. 26) when the *actual* reasons stated by the prosecutor are in the record before us (*id.* at p. 22). The court traces this odd approach to *People v. Welch* (1999) 20 Cal.4th 701, 746, a decision that predates *Johnson v. California* (2005) 545 U.S. 162 (*Johnson*). In my view, the reasoning of *Johnson* entails a different rule: A prosecutor's statement of actual reasons necessarily moves the *Batson* inquiry to the third stage. Here the trial court should have evaluated whether the stated reasons were genuine or pretextual, and its failure to do so provides no reason for this court to commit the same error.

1

While recognizing that a prosecutor's statement of reasons can render moot the preliminary issue of whether the defendant has made a prima facie showing, the court says this rule "applies only when *the trial court explicitly or implicitly evaluates the prosecutor's stated reasons*." (Maj. opn., *ante*, at p. 24.) This limitation misapprehends the purpose of *Batson*'s three-stage framework: "The *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process. [Citation.] The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question." (*Johnson*, *supra*, 545 U.S. at p. 172.)

The first stage of the *Batson* inquiry asks whether the defendant has raised an inference of discrimination. (*Johnson*, *supra*, 545 U.S. at p. 170.) "[W]here the explanation for a prosecutor's strike of a particular juror is so obvious that there is little or no reason to think anything else could have motivated the strike," a trial court may reject a *Batson* claim without requiring the prosecutor to say anything. (*People v. Harris* (2013) 57 Cal.4th 804, 872 (conc. opn. of Liu, J.); see *id.* at p. 873 ["trial courts need not and should not subject prosecutors to idle inquiry . . ."].) But if a prima facie case has been shown, then the analysis moves to the second stage: The prosecutor must give a reason for the strike. (*Johnson*, at p. 168.)

Thus, the purpose of *Batson*'s first stage is simply to decide whether the prosecutor must state a reason for the strike. This decision becomes moot once the prosecutor has stated a reason for the strike, whether the prosecutor was required to do so or not. Once the prosecutor has stated a reason, even if voluntarily, the cat is out of the bag, and the *Batson* analysis moves to the third stage. The prosecutor must "stand or fall on the plausibility of the reasons he gives," and

2

courts must evaluate those reasons in light of " 'all relevant circumstances.' "
(*Miller-El v. Dretke* (2005) 545 U.S. 231, 240, 252; see *Holloway v. Horn* (3d Cir.
2004) 355 F.3d 707, 723–724 (*Holloway*) ["[T]he question of whether a prima
facie case has been established becomes moot . . . when the prosecutor provides
explanations for the strikes despite the absence of a request from the trial
court. . . . '[O]nce a prosecutor attempts to explain a peremptory challenge, we
believe the trial and reviewing courts should look to the entire record to determine
if intentional discrimination is present.' "].)

This approach is consistent with the burden-shifting framework used to
evaluate claims of intentional discrimination under title VII of the Civil Rights Act
of 1964 (42 U.S.C. § 2000e et seq.), a framework on which *Batson* expressly
relied. (See *Batson*, *supra*, 476 U.S. at p. 94, fn. 18.) In explaining "the operation
of prima facie burden of proof rules" (*ibid.*), *Batson* cited *U.S. Postal Service
Board of Governors v. Aikens* (1983) 460 U.S. 711. There the high court, in an
opinion by then Justice Rehnquist, explained that "[t]he *prima facie* case method"
is " 'merely a sensible, orderly way to evaluate the evidence in light of common
experience as it bears on the critical question of discrimination.' [Citation.]
Where the defendant has done everything that would be required of him if the
plaintiff had properly made out a *prima facie* case, whether the plaintiff really did
so is no longer relevant. The [trial] court has before it all the evidence it needs to
decide whether 'the defendant intentionally discriminated against the plaintiff.'
[Citation.]" (*Id.* at p. 715.)

Under today's opinion, the prosecutor's voluntary explanation of a
contested strike does not waive a favorable first-stage ruling; it simply makes a
record that may justify the strike if the first-stage ruling is found erroneous on
appeal. (Accord, *Robinson v. U.S.* (D.C. 2006) 890 A.2d 674, 682–683.) But
what if a trial court correctly finds no prima facie case at the first stage, yet the

3

prosecutor volunteers a reason that is suspicious?  The court suggests that if a prosecutor volunteers a "facially invalid" reason, that would present a different case.  (Maj. opn., *ante*, at p. 25, fn. 5.)  But what if the prosecutor offers a facially valid reason that is contradicted by the record of voir dire?  Suppose, in this case, that the prosecutor had said, "I struck P.M. because he said he's not sure he supports the death penalty," when in fact the record showed that P.M. expressed unequivocally strong support for the death penalty.  The court's approach does not require the trial judge to evaluate such a facially valid yet unsubstantiated reason.  Nor does it require or even permit a reviewing court to do so if the trial judge has made only a first-stage ruling.  Again, "[t]he *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process."  (*Johnson*, *supra*, 545 U.S. at p. 172.)  Once those "actual answers" have been produced, they necessarily become the focus of the *Batson* inquiry.  Otherwise, courts could " 'effectively close their eyes to [a prosecutor's improper reasons] by simply deciding that the defendant has not made out a prima facie case.' "  (*Holloway*, *supra*, 355 F.3d at p. 724.)  Neither today's opinion nor any case on which it relies answers this concern.

More fundamentally, the court's felt need to distinguish cases where a prosecutor volunteers an improper reason reveals the illogic of its approach.  For the very premise of any such distinction is that the case now before us is *not* one where the prosecutor has volunteered an improper reason.  But how could a trial court or a reviewing court possibly know that without having "explicitly or implicitly" evaluated the reason stated by the prosecutor?  (Maj. opn., *ante*, at p. 24.)  If courts are to distinguish between proper and improper reasons, then the *Batson* inquiry has necessarily moved past the first stage to the third stage.

Importantly, the facial validity of a volunteered reason cannot (backwardly) inform a first-stage ruling.  *Batson*'s three-stage inquiry at no point authorizes

4

courts to merely peek at the credibility of a prosecutor's stated reason without fully evaluating it in light of all relevant circumstances.  Such an approach would conflate the first and third stages of the *Batson* framework since the first stage examines not whether a prosecutor's stated reason is facially valid or otherwise credible, but only whether the prosecutor should be required to state a reason at all.  (See *Johnson*, *supra*, 545 U.S. at p. 171 ["The first two *Batson* steps govern the production of evidence that allows the trial court to determine the persuasiveness of the defendant's constitutional claim.  'It is not until the *third* step that the persuasiveness of the justification becomes relevant . . . .' "], italics in original.)  As Chief Judge Easterbrook explained in *Hooper v. Ryan* (7th Cir. 2013) 729 F.3d 782, a "state court err[s] in concluding . . . that a prima facie case can be defeated by a prosecutor's seemingly race-neutral explanation for the strikes. . . .  [I]t is important to keep the sequence of proof straight.  Evidence that raises an inference of discrimination creates a prima facie case; this in turn requires an explanation by the prosecutor and an evaluation by the judge whether the prosecutor is honest in articulating a non-racial reason for each challenge.  To say 'the prosecutor gave a reason, therefore there is no prima facie case' is to scramble the analysis in a way that potentially eliminates the need to evaluate the prosecutor's honesty." (*Id.* at pp. 786–787.)  In short, there are no half steps in the *Batson* framework.

The correct procedure is simply stated:  At the first stage of the *Batson* inquiry, the defendant need only raise "an inference that discrimination has occurred." (*Johnson*, *supra*, 545 U.S. at p. 170.)  If a trial court denies a *Batson* motion at the first stage, the prosecutor may choose to stand pat on that ruling. But if the prosecutor chooses to give an explanation for a contested strike, the first-stage ruling becomes moot, and the *Batson* analysis moves to the third stage. At that point, the court must assess the prosecutor's explanation in light of all

relevant circumstances, and the defendant must show "it was more likely than not that the challenge was improperly motivated" in order to prevail. (*Ibid.*) Genuinely race-neutral reasons should be judicially validated, while improper or implausible reasons should be ferreted out. Either way, there is no reason to ignore the prosecutor's explanation, and a trial court's refusal to evaluate the explanation does not freeze the *Batson* inquiry at the first stage. If the record on appeal is adequate to decide whether the explanation is credible, then the reviewing court should conduct a proper third-stage analysis. (See *People v. Lenix* (2008) 44 Cal.4th 602, 622.) Otherwise, the reviewing court should remand the matter to the trial court to determine if a third-stage analysis is practicable or if a new trial is required. (See *People v. Johnson* (2006) 38 Cal.4th 1096, 1103–1104.)

In this case, if the trial court had simply denied the *Batson* motion at the first stage, without more, I would affirm the ruling because P.M. "exhibit[ed] obvious signs of being unsuitable for the jury." (Maj. opn., *ante*, at p. 26; see *id.* at pp. 22–23, fn. 4.) But the prosecutor, having volunteered his reasons, is entitled to benefit from the credibility of those reasons. The trial court should have evaluated, and credited, the prosecutor's actual reasons, and this court should not compound the error by likewise ignoring what the prosecutor said.

In sum, I reject defendant's *Batson* claim on the ground that the prosecutor's stated reasons for striking P.M. were entirely legitimate and credible. In all other respects, I join the opinion of the court.


LIU, J.


6

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Sattiewhite

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S039894
**Date Filed:** June 30, 2014

_____

**Court:** Superior
**County:** Ventura
**Judge:** Lawrence Storch


_____

**Counsel:**

Peter R. Hensley, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Kenneth C. Byrne and David C. Cook, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Peter R. Hensley
315 Meigs Road, Suite A-382
Santa Barbara, CA  93109
(805) 403-8460

David C. Cook
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-4991