Filed 10/9/20  P. v. Breiner CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Modoc)

----

| | |
|---|---|
| THE PEOPLE, | C089247 |
| Plaintiff and Respondent, | (Super. Ct. No. F16398) |
| v. | |
| JACK LEE BREINER, | |
| Defendant and Appellant. | |

A jury found defendant Jack Lee Breiner guilty of premeditated murder of a peace officer engaged in the performance of his duties by means of discharging a firearm from a motor vehicle.  The jury also found defendant guilty of attempted murder and of possession of a firearm by a prohibited person.  As to the murder and attempted murder convictions, the jury found multiple firearm allegations true.  Following the sanity phase of trial, the jury found defendant sane when he committed the three offenses.  Following the penalty phase of trial, the jury sentenced defendant to life in prison without the possibility of parole.

1

On appeal, defendant contends the trial court erred by failing to hold a competency hearing. He further contends the trial court made two instructional errors that cumulatively prejudiced him. Defendant does not challenge any legal rulings made during or the verdicts resulting from the sanity and penalty phases of trial. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A

*Defendant's Background*

Defendant, according to his father, was always "a little off the rocker" and "not quite right in the head." His mother always had concerns about defendant's mental health because of a severe head injury he sustained when he was four years old that resulted in a month of hospitalization. As a child, defendant's speech was delayed and he took special education classes; however, defendant ultimately became an average student. Defendant began heavily drinking at the age of 14 and continued for decades. In 1989, when defendant was in his early 20's, he, his parents, and his two brothers moved to Modoc County. Defendant's mother noticed defendant's mental health started to decline around this time.

After moving to Modoc County and over the course of nearly three decades, defendant was arrested several times for low-level and alcohol-related offenses by the Modoc County Sheriff's Department. Because of these frequent arrests, defendant spent time in the Modoc County Jail. He claimed that, while incarcerated there, he was assaulted numerous times by Modoc County Sheriff's deputies and inmates at the deputies' direction or through their complicity. Defendant's family testified that defendant was often released from Modoc County Jail injured or would complain about physical and sexual assaults having occurred while incarcerated there. The deputy defendant most often complained of was Modoc County Sheriff's deputy Dan Nessling.

Deputy Nessling previously oversaw the Modoc County Jail and was indicted by a grand jury for misdemeanor excessive force and had been the subject of numerous

2

complaints and legal settlements regarding excessive force. "It [wa]s . . . stipulated that Deputy Nessling has screamed at, physically assaulted, battered, injured and terrified numerous arrestees, inmates and citizens without suffering any adverse disciplinary consequences from [Modoc County] Sheriff Mike Poindexter or prior sheriffs Bruce Mix or Mark Gentry." While Deputy Nessling no longer worked at the Modoc County Jail as a sergeant at the time of defendant's trial, he was still a deputy working patrol.

In August 2012, while defendant was incarcerated in the Modoc County Jail, he was severely injured when he was assaulted by another inmate who punched him in the face. The single punch resulted in an orbital blowout fracture, a detached retina, and a ruptured globe. While defendant was given immediate emergency treatment by the Modoc County Jail staff, the staff did not transfer defendant to a hospital for treatment for four days. A scan of defendant's brain performed around this time showed defendant had no brain defects.

After defendant was released from the Modoc County Jail in 2014, he lived in the bunkhouse on his parents' ranch. Over the course of the next two years, defendant started acting differently; he was reclusive and rarely left the house. He talked incessantly about various conspiracy theories supported by the radio program InfoWars and its host Alex Jones. This included the belief the government was medicating people with chemicals released by airplanes that flew overhead and that the Russian and Chinese governments were actively planning an invasion of the west coast. Defendant also believed aliens were watching him and were "gonna get us all." Defendant expressed fear in law enforcement and going to jail, specifically the Modoc County Jail where he thought he would be killed. He told his father and younger brother he would kill any deputy who attempted to arrest him. Defendant was increasingly paranoid that he was being followed or that the world was ending.

In the six months leading to October 19, 2016, defendant became increasingly agitated and prone to paranoid outbursts. He talked about foreign invasions and domestic

3

government authorities coming to get him. He said he saw the devil and horsemen of the apocalypse. Defendant's mother called Sheriff Poindexter to ask for help with defendant and shared that defendant had threatened to kill her and the family. Defendant's mother was told the Modoc County Sheriff's Department could not do anything to help her until defendant became violent.

In the days before October 19, 2016, defendant became even worse. He said an ankle monitor he was required to wear was put on him by the Chinese and Russian governments. He also accused his family of being part of a Russian conspiracy to monitor him and threatened to kill them. Defendant's mother sought help from Modoc County Behavioral Health. She and defendant's older brother also complained to defendant's parole officer about his behavior but were told there was nothing the parole officer could do to help them.

B

*The Shooting*

On the morning of October 19, 2016, defendant's father and older brother went to defendant's bunkhouse to collect empty water jugs to fill with filtered water for the family's use. When they got to the bunkhouse, they saw defendant had filled the water jugs with well water. Defendant said he had filled the jugs in order to prepare for an attack or for the end of the world. Defendant's father began emptying the water jugs when defendant entered and threw a "tantrum." Defendant hit his father and his father fell to the ground, where defendant then got on top of him. Defendant's older brother grabbed defendant and threw him against the wall before threatening to call 911. Defendant's older brother then walked out of the bunkhouse to make the call.

Modoc County Sheriff's deputy Julie Winkle took defendant's older brother's 911 call at 9:30 a.m. He told her he needed a deputy to come to the ranch because defendant was pushing his father around. Modoc County Sheriff's deputy Jack Hopkins overheard the call and responded. Several minutes after Deputy Hopkins responded to the call,

4

Sheriff Poindexter followed him in his own patrol vehicle. Sheriff Poindexter attempted to get in contact with Deputy Hopkins to tell him they should handle the call together, but was unable to reach him.

After making the 911 call, defendant's older brother walked over to his parents' house. When he looked back toward the bunkhouse, he saw defendant walking out with a rifle. As defendant walked, he yelled to his older brother that the older brother had just "caused [defendant's] death." Defendant pointed the gun at his older brother, causing his older brother to run to the back of the house. Defendant then got in his truck and drove slowly around the house and the bunkhouse before slowly driving down the long road leaving the ranch. During this time, defendant's older brother called 911 again to inform the dispatcher defendant was armed with a rifle. At 9:38 a.m., the dispatcher told Deputy Hopkins defendant was armed and Deputy Hopkins asked whether defendant's direction of travel was known, which it was not.

When defendant was about 500 feet from the house, Deputy Hopkins approached him in his patrol vehicle from the opposite direction. Defendant fired at Deputy Hopkins with his rifle from his truck. The bullet traveled through the windshield of Deputy Hopkins patrol vehicle and struck Deputy Hopkins's "right forehead and right eye nearly obliterating his right forehead and right eye and inflicting a lethal brain injury." Defendant got out of his truck and walked over to Deputy Hopkins's patrol vehicle and turned it off. He then got back in his truck, cut off his ankle monitor, and drove away until his truck got stuck in the mud further down the road.

At approximately 9:52 a.m., defendant saw Sheriff Poindexter approaching the ranch on a side road. Defendant got out of his truck and shot at Sheriff Poindexter's patrol vehicle. Sheriff Poindexter stopped his vehicle and radioed for help. Sheriff Poindexter was approximately 50 to 60 yards away. Defendant shot at Sheriff Poindexter two to three more times. At least one of those shots struck the patrol vehicle. Sheriff

5

Poindexter continued to drive an additional 100 yards away from defendant, where he safely retrieved his department-issued rifle to return fire.

When Sheriff Poindexter returned fire, he hit defendant in the knees and defendant stopped shooting at him. Deputies then arrived at Sheriff Poindexter's location and defendant was taken into custody without incident and given medical attention. Upon a search of defendant's truck, deputies discovered a change of clothes, boxes of bullets, a knife, a sleeping bag, cans of food, toilet paper, first aid items, a saw, a toothbrush, and a water jug. Defendant's medications were also found in the truck.

C

*Defendant's Statements*

On the way to the hospital defendant said he "was tired of them fucking with [him]. That's why [he] shot [Deputy Hopkins]." At the hospital, defendant was in a lot of pain and made several statements that his hands hurt even though he had no injury to his hands. Defendant also told his nurse with tears in his eyes that he "didn't mean to shoot [Deputy Hopkins]. It was an accident." Defendant further told a deputy guarding him that the deputy should "[j]ust take me to Modoc so I can plead guilty and go to jail." Defendant also told the deputy, "I am such a dumb ass. I should have stayed where I was and shot both their asses."

Several days after the shooting, defendant spoke with Butte County Sheriff's sergeant Matt Calkins. During that interview, defendant said he was scared when he saw Deputy Hopkins approaching him and thought he was going to be arrested. He shot at Deputy Hopkins from inside his truck to scare the deputy away. When he shot at Deputy Hopkins, defendant knew it was a bad idea and the wrong thing to do. Defendant at times contradicted himself or made scattered or irrelevant statements. For example, when asked why deputies were called to the ranch, defendant said it was to check on the cattle or the Islamic "foreigners" that "just fucking show up. And they were just fucking out there, they sleep in the shop or something." Defendant also said he could not remember

6

shooting at Deputy Hopkins and that he blacked out. He further claimed Sheriff Poindexter shot at him first and defendant shot back to scare the sheriff away.

A few days after that interview, defendant was interviewed again. He repeatedly told Sergeant Calkin that he would prefer to speak about the matter somewhere else and was uncomfortable. During that interview he claimed the United Nations raped his wife "a long time ago." Defendant's thoughts were scattered and he appeared at times unable to focus on the questions asked of him.

D

*Defendant's Mental Health*

Dr. Melissa Piasecki, a forensic psychiatrist, examined defendant. As part of her exam, she reviewed defendant's medical records from the Modoc Mental Health Center. Those records revealed defendant was diagnosed with schizoaffective disorder in 2014. Schizoaffective disorder is a blend of schizophrenia, which is a psychotic disorder, and a mood symptom, in this case both irritability and depression. The records further showed defendant had a nearly three-decade history of anxiety and depression. Following defendant's diagnosis, he was prescribed antipsychotic drugs to target his psychotic symptoms like delusions and possibly hallucinations. Defendant also received medications to help with his anxiety, as well as antidepressants.

A psychotic disorder, like schizophrenia, is marked by a break with reality. These breaks with reality take two forms -- delusions, which are fixed false beliefs, and hallucinations, which are false sensory perceptions. Defendant's medical records and statements from his family indicated defendant's delusions escalated in intensity in 2016 and he responded with increased amounts of agitation. It also appears he began hallucinating around this time. Hallucinations present a more pervasive problem than delusions and show a worsening of symptoms. Based on her exam, Dr. Piasecki believed defendant suffered from schizoaffective disorder or some form of schizophrenia.

7

After Dr. Piasecki examined defendant and formed this opinion, she received defendant's brain scan and reevaluated her diagnosis. The scan showed defendant had suffered a small stroke in the left temporal region of his brain, cutting off blood flow to that area. A stroke in that area of the brain would not affect a person's motor behavior, instead it would affect a person's memory and is associated with psychosis and other psychiatric problems. Based on Dr. Piasecki's review of all the records, she believed defendant had a psychotic disorder made worse by his medical condition, i.e., the stroke that cut off blood flow to his temporal lobe. Based on this diagnosis, Dr. Piasecki was of the opinion that when defendant acted on October 19, 2016, he made decisions based on facts that appeared true to him.

## DISCUSSION

## I

### *The Trial Court Did Not Err By Failing To Hold A Competency Hearing*

Defendant contends the trial court erred by failing to hold a competency hearing after his counsel declared a doubt as to defendant's competency and the trial court suspended proceedings and appointed two experts to evaluate defendant. The People counter that the trial court effectively fulfilled its obligation to hold a hearing and defense counsel impliedly submitted on the experts' evaluations. We do not agree with either party.

A trial court has a nondiscretionary obligation to suspend proceedings and hold a competency trial only when the trial court has declared a doubt as to a defendant's competency or defense counsel has supported his or her declaration of a doubt with substantial evidence. (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 465.) "Otherwise, we give great deference to the trial court's decision not to hold a competency trial." (*Ibid.*) Here, the trial court did not declare a doubt as to defendant's competence or find substantial evidence supported defense counsel's declaration. Thus, the trial court did not err by failing to hold a competency hearing.

A

*Background*

On January 8, 2018, defense counsel filed an affidavit and motion to suspend proceedings until determination of defendant's mental competence.  Defense counsel believed defendant to be incompetent to stand trial because he observed defendant "to be delusional and experienc[ing] substantial memory deficits" during his visits.  Defendant "is incapable of recalling the names, locations, and time frames for schools he has attended, doctors who treated him, hospitals where he was treated, me[n]tal health facilities where he was treated, and substance abuse programs he has attended."  A month before, defendant "refused an interview with a psychiatrist retained by the defense."  Based on conversations with defendant's family, defense counsel believed defendant had a "history of head trauma, substance abuse, and mental illness and that [he] has been treated for a mental condition at one or more mental health facilities."

On January 25, 2018, the trial court suspended proceedings pursuant to Penal Code[1] section 1368 and ordered defendant be evaluated.  In doing so, it stated it had "received and reviewed an affidavit by [defense counsel].  The affidavit is, of course, under oath and [counsel] has indicated to the Court that he is declaring a doubt pursuant to 1368 as to [defendant].  And the Court has reviewed and considered that and the Court's tentative, of course, would be to suspend proceedings based on [defense counsel's] observations, [and] statements that are contained in his affidavit."  After hearing no objections from the parties, the trial court stated it would "suspend proceedings pursuant to 1368 and the Court will appoint the required experts in this matter."

---

[1]    Further section references are to the Penal Code, unless otherwise indicated.

9

Two experts subsequently evaluated defendant and filed reports concluding defendant "was competent to assist counsel and understands the proceedings in this matter."

At a hearing on April 16, 2018, the trial court indicated it did not find substantial evidence of defendant's incompetence and was not going to hold a competency hearing. Defense counsel indicated he was not prepared to submit on the reports because an evaluation by "our doctor" revealed additional information. "[S]o at this point, defense is not prepared to stipulate or submit on the reports with regard to competency. I think it would behoove us to set a trial. We may get additional information from that doctor that would change that position, but I think it would be imprudent to go ahead and submit on those reports at this state."

The trial court denied defense counsel's request to set a hearing. It reasoned the standard to set a hearing was substantial evidence of defendant's incompetence. The trial court based its finding of no substantial evidence of defendant's incompetence on the fact defense counsel's declaration was not supported by the two psychological evaluations, both of which contained conclusions defendant was competent. "[S]o without substantial evidence, I wouldn't be setting it for hearing on the issue of competence, so I don't know why you haven't filed anything at this juncture if you felt that there was something sufficient to sway the Court."

The parties then moved on to determining a trial date for the underlying charges. As part of that discussion, defense counsel said, "[w]e were talking about setting the trial in August. If I had received [the doctor's] report . . . which I had not received, then there may be substantial evidence to have a trial on competency, but what I'd rather do, Judge, so we can have the schedule and keep moving forward, is if we go ahead and submit on the 1368 reports right now instead of having to re-raise competency, if I get that [doctor's] report, I think it's more efficient to reserve the competency issue for a future date and that way we can keep a trial date, we can set a motion date." The trial court

10

responded, "[w]e can keep a trial date. At this point, the Court's making the finding that there is not substantial evidence of incompetency to set a hearing and then it would require that the defense file something in the future if [it] want[s] to, so proceedings are restored."

B

*The Trial Court Did Not Declare A Doubt Or Find Substantial Evidence Of Defendant's*
*Incompetence, Thus It Was Not Required To Hold A Competency Hearing*

"The due process clause of the federal Constitution's Fourteenth Amendment prohibits trying a criminal defendant who is mentally incompetent." (*People v. Ary* (2011) 51 Cal.4th 510, 517.) "When a trial court is presented with evidence that raises a reasonable doubt about a defendant's mental competence to stand trial, federal due process principles require that trial proceedings be suspended and a hearing be held to determine the defendant's competence. [Citations.] Only upon a determination that the defendant is mentally competent may the matter proceed to trial. [Citation.] [¶] California law reflects those constitutional requirements." (*Ibid*.) Accordingly, " ' "state law require[s] a trial judge to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial." ' " (*People v. Sattiewhite*, *supra*, 59 Cal.4th at p. 464.)

In California, this law is codified in section 1368. Subdivision (a) of that section provides: "If, during the pendency of an action and prior to judgment . . . a doubt arises in the mind of the judge as to the mental competence of the defendant, he or she shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. . . . At the request of the defendant or his or her counsel or upon its own motion, the court shall recess the proceedings for as long as may be reasonably necessary to permit counsel to confer with

11

the defendant and to form an opinion as to the mental competence of the defendant at that point in time."

Subdivision (b) of section 1368 then provides: "If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Sections 1368.1 and 1369. If counsel informs the court that he or she believes the defendant is mentally competent, the court may nevertheless order a hearing. Any hearing shall be held in superior court." "[W]hen an order for a hearing into the present mental competence of the defendant has been issued, all proceedings in the criminal prosecution shall be suspended until the question of the present mental competence of the defendant has been determined." (§ 1368, subd. (c).)

Defendant argues subdivisions (a) and (b) of section 1368 are "alternative procedural mechanisms by which a reasonable doubt may arise as to a defendant's trial competence." Thus, according to defendant, if either his counsel or the trial court declares a doubt, then criminal proceedings cannot be reinstated absent a hearing pursuant to section 1369 to determine a defendant's competence. We disagree with defendant's interpretation of section 1368.

Section 1368, subdivisions (a) and (b) are not alternative procedural mechanisms by which to achieve a competency hearing under section 1369. Section 1368, subdivision (a) lays out the obligations of a trial judge in the event a doubt regarding defendant's competency arises in the judge's mind. Part of that obligation is to inquire defense counsel's opinion on the matter. Section 1368, subdivision (b) provides the procedure for the court to use depending on counsel's opinion. Together, subdivisions (a) and (b) of section 1368 provide the procedure when the trial court entertains a doubt regarding a defendant's competence. While defense counsel can alert the trial court to the issue of defendant's competence, the court is not required to entertain a doubt unless

12

counsel's opinion is supported by substantial evidence. (*People v. Sattiewhite*, *supra*, 59 Cal.4th at p. 465.)

Case law supports this interpretation. In *Sattiewhite*, our Supreme Court reviewed the principles applicable to determining whether a competency hearing is required. Our Supreme Court observed " '[c]ounsel's assertion of a belief in a client's incompetence is entitled to some weight,' " it " 'does not, in the absence of substantial evidence to that effect, require the court to hold a competency hearing.' " (*People v. Sattiewhite*, *supra*, 59 Cal.4th at p. 465.) Rather, "defense counsel must present expert opinion from a qualified and informed mental health expert, stating under oath and with particularity that the defendant is incompetent, or counsel must make some other substantial showing of incompetence that supplements and supports counsel's own opinion. Only then does the trial court have a nondiscretionary obligation to suspend proceedings and hold a competency trial. [Citation.] Otherwise, we give great deference to the trial court's decision not to hold a competency trial." (*Ibid*.)

Similarly in *Ary*, our Supreme Court stated that "[s]ection 1368, in subdivision (a), requires a trial court to suspend criminal proceedings at any time 'prior to judgment' if the court reasonably doubts 'the mental competence of the defendant.' A defendant can create reasonable doubt through substantial evidence of mental incompetence, or the trial court can raise the issue on its own." (*People v. Ary*, *supra*, 51 Cal.4th at p. 517; *People v. Lewis* (2008) 43 Cal.4th 415, 524, rejected on other grounds by *People v. Black* (2014) 58 Cal.4th 912, 919.)[2]

With this understanding of the relevant statutory and case law, subdivision (b) of section 1368 cannot be read as an alternative procedural mechanism to subdivision (a).

---

[2]    Both *Ary* and *Sattiewhite* interpreted a prior version of section 1368. (See Stats. 1998, ch. 932, § 40.) The statute's subsequent amendment did not change section 1368 in any relevant regard. (See § 1368.)

Instead, the two must be read together and stand for the proposition that once the trial court has declared a doubt or defendant's counsel has presented substantial evidence of defendant's incompetence to justify a doubt in the trial court's mind, defendant is entitled to a competency hearing pursuant to section 1369.

Defendant argues the trial court effectively declared a doubt or found substantial evidence supported counsel's declaration when it suspended criminal proceedings under section 1368 and ordered defendant be evaluated by two experts, both required components of a competency hearing under section 1369. Because these preliminary findings were made, defendant argues, the court was required to complete the competency hearing process. We disagree with defendant's underlying premise that the trial court declared a doubt or found substantial evidence supporting counsel's declaration.

Notably, the trial court never said it declared a doubt or found substantial evidence supported counsel's declaration that defendant was incompetent. It also did not mention its own observations of defendant or whether it agreed or disagreed with defense counsel's assessment. Nor did the trial court order a competency hearing, as it was required to do if it believed there was a doubt as to defendant's competence. The record indicates defense counsel communicated his doubt regarding defendant's competence to the court, and the court believed it was required to suspend criminal proceedings and appoint experts based on that communication. This was a mistake. (See §§ 1368, 1369.) This misconception, however, did not trigger the court's obligation to hold a competency hearing, contrary to defendant's contention. Defendant does not argue the court lacked discretion to suspend criminal proceedings or appoint experts absent the court's belief or substantial evidence of defendant's incompetence. While section 1368 entitles a defendant to these procedures if the court believes the defendant incompetent or finds substantial evidence supports counsel's declaration, nothing in the section precludes the court from following these procedures before determining for itself whether there is a

14

doubt as to a defendant's competence. That appears to be what happened here. Indeed, at the subsequent hearing on defendant's competence, the trial court was prepared to address whether substantial evidence of defendant's incompetence had been discovered.

Moreover, the trial court's appointment of experts does not signal it entertained a doubt as to defendant's competence or believed substantial evidence supported defense counsel's declaration. As our Supreme Court indicated, experts are often the tool to achieving the standard entitling a defendant to a hearing. (*People v. Sattiewhite*, *supra*, 59 Cal.4th at p. 465.) And while the trial court suspended criminal proceedings, it is not the suspension of criminal proceedings that entitles a defendant to a competency hearing. It is the trial court's doubt or substantial evidence supporting counsel's declaration and "[o]nly then does the trial court have a nondiscretionary obligation to suspend proceedings and hold a competency trial. [Citation.] Otherwise, we give great deference to the trial court's decision not to hold a competency trial." (*People v. Sattiewhite*, *supra*, 59 Cal.4th at p. 465.) Because the trial court did not declare its own doubt or find substantial evidence supported defense counsel's doubt, defendant was not entitled to a competency hearing. Accordingly, defendant's procedural due process rights were not violated, and the trial court did not err.[3]

## II

### *There Was No Instructional Error*

Defendant contends the court erred in two respects as it pertains to the imperfect self-defense instruction. First, he argues the court erred by instructing and then permitting the prosecutor to argue that, because defendant was the aggressor against his father, he could not rely on imperfect self-defense. Second, defendant argues the court

---

[3] Defendant does not argue his substantive due process rights were violated, only his procedural due process rights. Thus, we need not address whether his counsel's declaration provided substantial evidence of his incompetence.

15

erred by instructing the jury defendant could not rely on imperfect self-defense if it believed he acted under a delusion, without also defining the meaning of delusion. We disagree.

## A

### *Background*

Defendant requested the jury be instructed on imperfect self-defense. The court indicated it did not see sufficient provocation to justify the instruction. Defendant agreed in the context of a self-defense theory; however, he argued imperfect self-defense required only a subjective belief of provocation. The prosecution agreed with defendant, but requested a pinpoint instruction informing the jury that a "person who kills or attempts to kill while acting under a delusion cannot avail himself of imperfect self-defense." Defendant conceded this was an accurate statement of the law. The court agreed to give the prosecution's requested pinpoint instruction.

The prosecution later requested an additional pinpoint instruction regarding imperfect self-defense. According to the prosecution's theory, defendant could not rely on imperfect self-defense because he was the aggressor against his father. The theory continues that because Deputy Hopkins and Sheriff Poindexter were responding to defendant's aggression, defendant cannot rely on their response to show provocation under any circumstances. The court agreed to instruct the jury pursuant to this theory and allow the parties to argue the issue to the jury. Defendant did not object.

The jury was instructed on imperfect self-defense as follows: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense. [¶] . . . The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief and the need to use deadly force was reasonable.

"The defendant acted in imperfect self-defense if: One, the defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury.

16

And two, the defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; but three, at least one of those beliefs was an unreasonable belief. Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. [¶] In evaluating the defendant's belief, consider all the circumstances as they were known and appeared to the defendant. A danger is imminent if, when the fatal wound occurred, the danger actually existed or the defendant believed it existed. The danger must seem immediate and present so that it must be instantly dealt with. It may not be merely prospective or in the near future.

"Imperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force. [¶] If you find that [Deputy] Hopkins threatened or harmed the defendant or others in the past, you may consider that information in evaluating the defendant's beliefs. If you find that the defendant knew that [Deputy] Hopkins had threatened or harmed others in the past, you may consider [that fact]."

"A person who kills or attempts to kill while acting under a delusion cannot avail himself of imperfect self-defense. . . . [¶] The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. If [t]he People have not met this burden, you must find the defendant not guilty of murder."

B

*Legal Authority*

" ' "The rules governing a trial court's obligation to give jury instructions without request by either party are well established. 'Even in the absence of a request, a trial court must instruct on general principles of law that are . . . necessary to the jury's understanding of the case.' [Citations.] That obligation comes into play when a statutory term 'does not have a plain, unambiguous meaning,' has a 'particular and restricted meaning' [citation], or has a technical meaning peculiar to the law or an area of law [citation]." [Citation.] "A word or phrase having a technical, legal meaning requiring

17

clarification by the court is one that has a definition that differs from its nonlegal meaning." ' [Citation.] 'We consider the challenged instruction in the context of the instructions and record as a whole to ascertain whether there is a reasonable likelihood the jury impermissibly applied the instruction.' " (*People v. Garcia* (2020) 46 Cal.App.5th 123, 154-155.)  We independently review the correctness and adequacy of the trial court's instructions, examining whether the court " 'fully and fairly instructed on the applicable law.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

Although a trial court has a duty to adequately instruct on the law, "it has no duty to give clarifying or amplifying instructions absent a request." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1331; see *People v. Sanders* (1995) 11 Cal.4th 475, 533-534.)  Failure to request a clarifying or amplifying instruction results in forfeiture of the issue on appeal. (*People v. Richardson* (2008) 43 Cal.4th 959, 1022-1023.) "[D]efendant is not entitled to remain mute at trial and scream foul on appeal for the court's failure to expand, modify, and refine standardized jury instructions." (*People v. Daya* (1994) 29 Cal.App.4th 697, 714.)

C

*The Court Adequately Instructed On An Aggressor's*

*Ability To Rely On Imperfect Self-Defense*

Defendant contends it was error for the court to instruct the jury that "[i]mperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force."  Specifically, he argues "[t]his grossly oversimplified and misleading instruction told the jury that [defendant's] 'wrongful conduct' in assaulting his father deprived [defendant] of the right to [rely] on imperfect self-defense, no matter what [defendant] had subjectively believed or -- for that matter -- no matter what amount of hypothetical force Deputy Hopkins might have used against [defendant]."  Notably, defendant does not argue this is an inaccurate statement of the law.  Indeed, he argues only that it is an oversimplification of the law, which coupled

18

with the prosecutor's argument defendant "could not *as a matter of law* [rely] on imperfect self-defense because he assaulted his father," became a legally invalid theory of guilt.

We agree with defendant that a person is precluded from relying on imperfect self-defense if he or she " 'created circumstances' under which the 'attack' *as mistakenly perceived by the defendant* had been '*legally justified*.' "  In other words, a defendant may be able to rely on an imperfect self-defense theory if the jury believed that, after committing a simple assault against a civilian victim, a defendant believed a deputy was going to imminently murder him or her when coming to the civilian victim's aid.  (See *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179-1180 ["the defense is available when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant"].)  The instructions as given, however, said this.

The jury was instructed that "[i]mperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that *justify* his adversary's use of force."  (Italics added.)  A mere assault does not justify an adversary's use of deadly force.  Indeed, as part of the self-defense instruction, the jury was told a justified use of force is the "amount of force that a reasonable person would believe is necessary in the same situation."  Read together, the jury was told imperfect self-defense was not available when defendant created the circumstances in which his adversary was perceived to use an "amount of force that a reasonable person would believe is necessary in the same situation."  Conversely, if the adversary was perceived to use an amount of force a reasonable person would believe is unnecessary in the same situation, then defendant could rely on imperfect self-defense.  Accordingly, the trial court adequately instructed on the law.  We assume the jury read, understood, and followed these instructions.  (*People v. Lucas* (2014) 60 Cal.4th 153, 321.)  Moreover, the jury was instructed it had to follow the law as it was explained in the instructions and that the

19

instructional language controlled over counsel's argument.  Thus, while the prosecution implied to the jury defendant was precluded from relying on imperfect self-defense under any circumstances, the jury was required to reject the argument to the extent it conflicted with the instructions before it.[4]

To the extent defendant argues the court should have included the definition of justified use of force with the imperfect self-defense instruction, that argument is forfeited.  The trial court adequately instructed on the law, thus any alteration to the instructions could have been addressed with an amplifying or clarifying instruction. Because defendant did not request one here, his appellate argument the court erred by instructing the way it did is forfeited.

D

*The Court Adequately Instructed On The Meaning Of A Delusion*

Defendant contends the court erred by failing to define a delusion when it instructed the jury pursuant to *People v. Elmore* (2014) 59 Cal.4th 121, that "[a] person who kills or attempts to kill while acting under a delusion cannot avail himself of imperfect self-defense."  According to defendant, *Elmore* defined a delusion for the purposes of this legal proposition as " 'entirely delusional beliefs,' 'purely delusional beliefs,' and 'psychotic delusions' without 'an objective correlate.' "  He argues the court's failure to instruct the jury on this definition resulted in the jury applying the wrong legal standard, especially given some of defendant's fears were based on the realistic circumstances of his history with the Modoc County Sheriff's Department.

The problem with defendant's argument is that the only definition of a delusion provided to the jury, which was presented through defendant's expert during testimony, was a fixed false belief marked by a break with reality.  This nonlegal definition of a

---

[4]     Defendant does not challenge the prosecutor's argument on other grounds or the court's overruling of trial counsel's objections to those arguments.

delusion is the same as our Supreme Court's definition in *Elmore*. (See *People v. Elmore*, *supra*, 59 Cal.4th at pp. 136-137 ["unreasonable self-defense, as a form of mistake of fact, has no application when the defendant's actions are entirely delusional. . . . The line between mere misperception and delusion is drawn at the absence of an objective correlate].) Both require false beliefs removed from reality or objectivity. Given the only definition of a delusion supplied to the jury was the definition announced in *Elmore*, the trial court adequately instructed the jury when it referred to a delusion, without clarification, as prohibiting reliance on imperfect self-defense. Thus, any clarification or amplification of the definition of a delusion needed to be requested. Failure to do so resulted in forfeiture of the argument.

## III

### *There Was No Cumulative Error*

Defendant argues cumulative error. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) Because we concluded no error occurred, there was no error to cumulate.

## DISPOSITION

The judgment is affirmed.

/s/_____
Robie, J.

We concur:

/s/_____
Hull, Acting P. J.

/s/_____
Renner, J.

21